# ATLANTIC COAST LINE RAILROAD COMPANY *v.* ·RIVERSIDE MILLS.

## ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF GEORGIA.

No. 215. Argued October 19, 20, 1910.—Decided January 3, 1911.

A provision in a bill of lading issued by the initial carrier, that it should not be liable for loss or damage not ·occurring on its portion of the route, is not a contract of exemption from its own liability as a carrier, but a provision of non-assumption of the liabilities of others and at common law relieves it of such liabilities.

The general rule adopted by this court is that, in the absence of legislation, a carrier, unless there be a special contract, is only bound to carry over its own line and then deliver to a connecting carrier; it may, however, contract to carry beyond its line, and if it does so its common-law carrier liability extends over the entire route.

It was not only the legal elements of the situation, but also the fact that the business prosperity of the country largely depends on through rates and routes of transportation, that induced Congress to enact such regulations in regard to the duties and liabilities of interstate carriers as would relieve shippers whose goods were damaged from the burden of proving where the loss occurred.

There is no absolute freedom of contract. The Government may deny liberty of contract by regulating ·or forbidding every contract reasonably calculated to injuriously affect public interests.

The United States is a Government of limited and delegated powers but in respect to the powers delegated, including that to regulate commerce between the States, the power is absolute except as limited by other provisions of the Constitution.

Congress has power to prohibit a carrier engaged in interstate commerce from limiting by contract its liability beyond its own line,

and the Carmack amendment of January 29, 1906, c. 3591, 34 Stat. 584, 595, to § 20 of the Interstate Commerce Act, making such carriers liable for loss or damage to merchandise received for interstate transportation beyond their own lines, notwithstanding any contract of exemption in the bill of lading, is a valid exercise of such power and is not in conflict with the due process provision of the Fifth Amendment.

*Quære*, and not decided, whether a carrier can be compelled to accept goods for transportation beyond its own lines or be required to make a through or joint rate over independent lines.

Under the Carmack amendment to the Interstate Commerce Act, the initial carrier is, as principal, liable not only for its own negligence, but that of any agency which it may use, although as between themselves the carrier actually causing the loss may be primarily liable.

Section 8 of the act to regulate commerce of February 4, 1887, c. 104, 24 Stat. 379, 382, does not authorize the taxing of an attorney's fee in an action to recover damages for loss to goods which does not result from a violation of the act.

168 Fed. Rep. 987 and 990, affirmed.

THIS was an action to recover the value of goods received by the Atlantic Coast Line Railroad at a point on its line in the State of Georgia for transportation to points in other States. The agreed statement of facts showed that the goods were safely delivered by the Atlantic Coast Line Railroad to connecting carriers, and were lost while in the care of such carriers, and the question is whether the initial carrier is liable for such loss.

The stipulated facts showed that the goods were tendered to the Atlantic Coast Line Railroad and through bills of lading demanded therefor, which were duly issued, as averred, on the dates named in the petition. That the goods so received were forwarded over the lines of the receiving road and in due course delivered to a connecting carrier engaged in interstate shipment for continuance of the transportation. It was also stipulated "that the Riverside Mill made constant and frequent shipments over the Atlantic Coast Line, and had a blank form of receipt, like the attached, marked 'A,' which the

Riverside Mill filled out, showing what goods it had loaded into cars and the name of the consignee; said receipt containing a stipulation that the shipment is 'per conditions of the company's bill of lading,' and that the Atlantic Coast Line Railroad Company, on said receipts prepared by the Riverside Mill, issued, for each of the shipments hereinbefore referred to, bills of lading on forms like that attached, marked exhibit 'B.' "

Upon the reverse side of the bill of lading were certain conditions, one of which was that "No carrier shall be liable for loss or damage not occurring on its portion of the route." The tenth clause thereof was in these words:

"This bill of lading is signed for the different carriers who may engage in the transportation, severally but not jointly, each of which is to be bound by and have the benefits of the provisions thereof, and in accepting this bill of lading the shipper, owner and consignee of the goods, and the holder of the bill of lading, agree to be bound by all its stipulations, exceptions and conditions, whether printed or written."

The court below, upon this state of facts, instructed a verdict for the plaintiff, upon which there was judgment for the amount of the verdict, and, upon motion of the plaintiff, an attorney's fee of $100 was ordered to be taxed as part of the costs in the case. Thereupon error was assigned, and this writ of error sued out by the railroad company.

*Mr. J. R. Lamar,* for plaintiff in error in this case and *Mr. C. H. Moorman,* with whom *Mr. B. D. Warfield* and *Mr. Henry L. Stone* were on the brief, for plaintiff in error in No. 286:[1]

The cases below hold that the statute is a great convenience to the shipper; is declaratory of the common law; that the initial carrier at common law is liable beyond its

---

[1] See *post,* p. 209.

line, and can be prohibited from limiting an existing liability beyond its line; that amendment becomes a part of the contract, and as the goods are voluntarily accepted for interstate shipment, they are therefore subject to interstate regulations of Congress; that contracts of exemption are rendered ineffectual by this statute, and that Congress has the same power to regulate commerce as it has to regulate the relation of master and servant; that it is an incident of the right to make through and joint rates. *Smeltzer Case,* 158 S. W. Rep. 649; *L. & N. R. R. Co.* v. *Scott,* 118 S. W. Rep. 992; *Pittsburg Ry. Co.* v. *Mitchell,* 91 N. E. Rep. 735; *Galveston* v. *Piper,* 115 S. W. Rep. 108; *St. Louis* v. *Grayson,* 115 S. W. Rep. 933; *Greenwald* v. *Weir,* 115 N. Y. Supp. 311.

Plaintiff in error, however, claims that the act deprives both the initial carrier and the shipper of the right to make a just and reasonable contract which it could do at common law. 1 Hutchinson on Carriers, 3d ed., 153, 233, 405; *Cau* v. *Texas & Pacific Ry. Co.,* 194 U. S. 424; *Michigan Central* v. *Myrick,* 107 U. S. 102. This is contrary to the Fifth Amendment, *Allgeyer* v. *Louisiana,* 165 U. S. 589; *Lochner* v. *New York,* 198 U. S. 45; *Adair* v. *United States,* 208 U. S. 161, 174, as is also the provision that the initial carrier "shall issue a bill of lading" and "shall be liable to the holder of the bill of lading for any damage caused by any connecting carrier. *Attorney General* v. *Old Colony R. R. Co.,* 22 L. R. A. 112; *Norfolk R. R. Co.* v. *Stuart Co.,* 63 S. E. Rep. 415; *McCann* v. *Eddy* (Mo.), 27 S. W. Rep. 541; Cooley's Const. Lim., 7th ed., 150; *Lindsey Co.* v. *Mullen,* 176 U. S. 155, 143; *Rodgers* v. *Camp,* 44 Connecticut, 297; *Colon* v. *Lisk,* 47 N. E. Rep. (N. Y.) 333; *Ohio &c. R. R. Co.* v. *Lacey,* 78 Illinois, 55; *Knoxville R. R. Co.* v. *McMillan,* 65 L. R. A. 296; *Woodward* v. *Vermont Central R. R. Co.,* 62 N. E. Rep. 1051; 180 Massachusetts, 599; 217 U. S. 196, 205; *Dirkin* v. *Kingston Coal Co.,* 171 Pa. St. 199, 203; *S. C.,* 50 Am. St. Rep.

805; *Williams* v. *Thaylor Co.*, 40 L. R. A. 812 (W. Va.); *Missouri R. R. Co.* v. *Nebraska*, 164 U. S. 403; *Same* v. *Same*, 217 U. S. 196.

Giving the initial carrier its day in court does not save the statute, as no provision for hearing will support a statute that takes the property of A to pay the debt of B. *Chicago &c. R. R. Co.* v. *Chicago*, 166 U. S. 234; *Long Island Water Co.* v. *Brooklyn*, 166 U. S. 695; *Taylor* v. *Porter*, 4 Hill (N. Y.), 140.

The act does not even give the connecting carrier its day in court. It is bound by the judgment without notice, and if it had notice, the connecting carrier is not estopped from showing that it was free from negligence. *Robins* v. *Chicago*, 2 Black, 418; *City of Boston* v. *Worthington*, 10 Gray, 496; *Lincoln* v. *First Nat. Bank*, 60 L. R. A. 924.

The act would make a connecting carrier in Canada liable on shipment from New York to Detroit, though manifestly the Canadian company is not subject to the provisions of the Hepburn bill.

Even if the judgment against the initial carrier does bind the connecting carrier, that could not satisfy the requirement of the Constitution, for a subsequent and contingent right to an action at law against corporations or individuals of undefined responsibility is not the compensation which the Constitution requires. *Bloodgood* v. *Mohawk*, 31 Am. Dec. 368; *Haverhill* v. *Commissioners*, 103 Massachusetts, 120; *Stockyard Co.* v. *L. & N. R. R. Co.*, 192 U. S. 568; *Cherokee Nation* v. *Sou. Pac. R. R. Co.*, 135 U. S. 661.

The statute is not a valid exercise of the power to regulate commerce. Citizens have the right to engage in interstate commerce. *Crutcher* v. *Kentucky*, 141 U. S. 57. They are not obliged to yield to an unconstitutional statute as condition precedent to so doing. Nor can Congress treat the right as a privilege not to be availed of except

upon such conditions it may prescribe, if the conditions are otherwise beyond the power of Congress. *Employers' Liability Case,* 207 U. S. 502; *Adair Case,* 208 U. S. 180. The grant to the National Government under the commerce clause is subject to the limitations of the Fifth Amendment. *Monongahela Bridge Co.* v. *United States,* 148 U. S. 345.

The power to regulate commerce includes the power to facilitate and expedite transportation of goods, but does not authorize the prohibition of the reasonable and just contracts under which commerce has been developed, and which do not, and are not intended to, impede commerce. *Railroad Co.* v. *Richmond,* 19 Wall. 589, 590; *Central Ry. Co.* v. *Murphy,* 196 U. S. 204, 205; *Lottery Case,* 188 U. S. 362.

The statute contains provisions which are not valid regulations of interstate commerce. The initial carrier cannot be made liable on the theory that Congress has power to make through and joint rates. For the making of through and joint rates is essentially contractual. *Star Co.* v. *Atchison R. R. Co.,* 14 I. C. C. 354; *Kentucky Bridge Co.* v. *L. & N. R. R. Co.,* 37 Fed. Rep. 630; and the courts have never decided to what extent the carrier can be required to make through and joint rates. *Sou. Pac. R. R. Co.* v. *I. C. C.,* 200 U. S. 553; *Atchison Ry. Co.* v. *Denver &c. Ry. Co.,* 110 U. S. 680; *Cole* v. *Central,* 86 Georgia, 255; *Burlington Ry. Co.* v. *Dey,* 82 Iowa, 312; *S. C.,* 31 Am. St. Rep. 490, 499; *Jacobson* v. *Wisconsin,* 70 Am. St. Rep. 364; 179 U. S. 292; *Central Stockyards* v. *L. & N. R. R. Co.,* 192 U. S. 571; *Chicago &c. Ry. Co.* v. *Osborne,* 52 Fed. Rep. 915; *Int. Com. Com.* v. *Stickney,* 215 U. S. 98, 106; *Penn Ref. Co.* v. *Western &c. R. R. Co.,* 208 U. S. 208, 222.

Limited liability acts of Congress, whether passed in pursuance of the admiralty jurisdiction or the commerce clause, or both, were primarily intended to prevent the making of unreasonable stipulations in bills of lading

(*The Delaware,* 161 U. S. 472), and at most only related to the liability of owners for their own negligence, and did not make them or the vessel liable for injuries occasioned by the negligence of another vessel by which the goods might be forwarded.

The initial carrier is not liable on the ground stated in the *Smeltzer Case,* 158 Fed. Rep. 661, that the act became a part of the contract, for if the act is void, it imposes no duties, and is as though it had never been passed. *Norton* v. *Shelby County,* 118 U. S. 426; *Cleveland* v. *Clemmons,* 59 L. R. A. 775; *People ex rel. Rodgers* v. *Koler,* 166 N. Y. 1; *S. C.,* 52 L. R. A. 814.

Nor has the company voluntarily made itself liable. *Lake Shore Ry. Co.* v. *Smith,* 173 U. S. 697.

The contract under which the goods were received is an entirety. Part of it cannot be laid hold of to acquire interstate jurisdiction, and the balance ignored, whereby interstate relation is stipulated to cease in law, when it ceases in fact by delivery to the next carrier. *McCarn* v. *International Co.,* 19 S. W. Rep. 549; *Hartley* v. *St. Louis Co.;* 89 N. W. Rep. 88; *Railroad Co.* v. *Richmond,* 19 Wall. 589; *Michigan Central R. R. Co.* v. *Myrick,* 107 U. S. 110.

The statute imposes mandatory requirements instead of permissive provisions at common law, and the Missouri statute in part copied by the Carmack amendment was sustained because the provisions were not mandatory. *Missouri Ry. Co.* v. *McCann,* 174 U. S. 580.

The provision as to attorney's fees under § 8, also takes property without due process of law. *Gulf &c. R. R. Co.* v. *Ellis,* 165 U. S. 150, 160.

*Mr. John Maynard Harlan* and *Mr. Lewis W. McCandless,* by leave of the court, filed a brief attacking the constitutionality of certain portions of § 20 of the act to regulate commerce.

*Mr. R. J. Southall,* with whom *Mr. Charles Akerman* and *Mr. Alexander Akerman* were on the brief, for defendant in error, submitted:

The mischief sought to be remedied by the statute was the trouble, delay, and expense to the shipper in collecting claims for loss or damage by the carriers. *Cent. of Ga. Ry. Co. v. Murphey,* 196 U. S. 194.

The constitution gives Congress full power to regulate interstate commerce. *Gibbons v. Ogden,* 9 Wheat. 196; *Howard v. Ill. Cent. R. R. Co.,* 207 U. S. 463; *Smeltzer v. St. Louis & S. F. R. R. Co.,* 158 Fed. Rep. 649; *Lottery Case,* 188 U. S. 321.

Section 20 of the Hepburn bill (Carmack amendment) was only intended to compel the carriers to return to the common-law rule which made the initial carriers liable, in the absence of contract limiting the carrier to liability for loss occurring on its own line, and to prohibit such contracts as being contrary to the declared public policy of the United States. *A., T. & S. F. R. R. Co. v. D. & N. O. R. R. Co.,* 110 U. S. 688; *Southern Pacific Co. v. Crenshaw,* 5 Ga. App. 675; *S. C.,* 63 S. E. Rep. 865; *Smeltzer v. St. Louis & S. F. R. R. Co.,* 158 Fed. Rep. 649.

The liberty of contract guaranteed by the Constitution is subject to such reasonable restraints as may be imposed by Congress for the public good and general welfare. *Adair v. United States,* 208 U. S. 161; *United States v. Traffic Association,* 171 U. S. 571; *United States v. Trans-Missouri Assn.,* 166 U. S. 290; *Addyston Pipe & Steel Co. v. United States,* 175 U. S. 211; *Northern Securities Co. v. United States,* 193 U. S. 197; *Swift & Co. v. United States,* 196 U. S. 375.

Railroad companies are subject to legislative control for the protection of the public. *N. Y. & N. E. R. R. Co. v. Bristol,* 151 U. S. 556; *Nashville, C. & St. L. R. R. Co. v. Alabama,* 128 U. S. 96; *Georgia R. & Bkg. Co. v. Smith,* 128 U. S. 174; *Minneapolis & St. L. R. R. Co. v. Beck-*

*with*, 129 U. S. 26; *Dent* v. *West Virginia*, 129 U. S. 114; *Charlotte, C. & S. R. R. Co.* v. *Gibbes*, 142 U. S. 386; *Minneapolis & St. L. R. R. Co.* v. *Emmons*, 149 U. S. 364.

Congress may fix a new rule of civil liability in matters of interstate commerce. Act of March 2, 1893, 27 Stat. 531; *Johnson* v. *Sou. Pac. Co.*, 196 U. S. 1.

As to the power of Congress to regulate the liability of carriers and others engaged in interstate commerce for injury to person or property, see *Sherlock* v. *Alling*, 93 U. S. 99; *Missouri R. R. Co.* v. *Mackey*, 127 U. S. 205; *Baltimore & Ohio R. R. Co.* v. *Baugh*, 149 U. S. 368; *Chicago, M. & St. P. R. R. Co.* v. *Solan*, 169 U. S. 133; *Martin* v. *Pittsburg & L. E. R. R. Co.*, 203 U. S. 284.

It is for Congress to determine what public policy requires with respect to common carriers engaged in interstate commerce. *United States* v. *Joint Traffic Assn.*, 171 U. S. 569, 571; *Missouri R. R. Co.* v. *Mackey*, 127 U. S. 205.

The allowance of attorneys' fees was proper. *Seaboard Air Line* v. *Seegers*, 207 U. S. 73; *Montague & Co.* v. *Lowry*, 193 U. S. 38.

*Mr. Wm. S. Kenyon*, Assistant to the Attorney General, with whom *The Attorney General* was on the brief, by leave of the court for the United States, as *amicus curiæ* in support of the constitutionality of § 20 of the act of June, 1906.

After making the above statement, Mr. Justice Lurton delivered the opinion of the court.

The goods of the defendants in error were lost by a connecting carrier to whom they had been safely delivered. Though received for a point beyond its own line and for a point on the line of a succeeding carrier, there was no agreement for their safe carriage beyond the line of the plaintiff in error, but, upon the contrary, an express

agreement that the initial carrier should not be liable for "a loss or damage not occurring on its own portion of the route." Such a provision is not a contract for exemption from a carrier's liability as such, but a provision making plain that it did not assume the obligation of a carrier beyond its own line, and that each succeeding carrier in the route was but the agent of the shipper for a continuance of the transportation. It is therefore obvious that at the common law an initial carrier under such a state of facts would not be liable for a loss through the fault of a connecting carrier to whom it had, in due course, safely delivered the goods for further transportation. *Railroad* v. *Pratt,* 22 Wall. 123; *Myrick* v. *Railroad,* 107 U. S. 102; *Southern Pac. Ry.* v. *Interstate Commerce Commission,* 200 U. S. 536, 554. Liability is confessedly dependent upon the provision of the act of Congress regulating commerce between the States known as the Carmack amendment of January 29, 1906, c. 3591, § 7, 34 Stat. at Large, 584, 595. The twentieth section of the act of February 4, 1887, c. 104, 24 Stat. at Large, 379, as changed by the Carmack amendment, reads as follows:

"That any common carrier, railroad, or transportation company receiving property for transportation from a point in one State to a point in another State shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad or transportation company to which such property may be delivered or over whose line or lines such property may pass, and no contract, receipt, rule or regulation shall exempt such common carrier, railroad, or transportation company from the liability hereby imposed. Provided, That nothing in this section shall deprive any holder of such receipt or bill of lading of any remedy or right of action which he has under existing law.

"That the common carrier, railroad, or transportation company issuing such receipt or bill of lading shall be entitled to recover from the common carrier, railroad, or transportation company on whose line the loss, damage or injury shall have been sustained the amount of such loss, damage, or injury as it may be required to pay to the owners of such property, as may be evidenced by any receipt, judgment, or transcript thereof."

The power of Congress to enact this legislation has been denied, first, because it is said to deprive the carrier and the shipper of their common-law power to make a just and reasonable contract in respect to goods to be carried to points beyond the line of the interstate carrier; and, second, that in casting liability upon the initial carrier for loss or damage upon the line of a connecting carrier the former is deprived of its property without due process of law.

The indisputable effect of the Carmack amendment is to hold the initial carrier engaged in interstate commerce and "receiving property for transportation from a point in one State to a point in another State" as having contracted for through carriage to the point of destination, using the lines of connecting carriers as its agents

Independently of the Carmack amendment the carrier, when tendered property for such transportation, might elect to contract to carry to destination, in which case it necessarily agreed to do so through the agency of other and independent carriers in the line; or, it might elect to carry safely over its own lines only and then deliver to the next carrier, who would then become the agent of the shipper. In the first case the receiving carrier's liability, as carrier, extends over the whole route, for, on obvious grounds, the principal is liable for the acts of its agent. In the other case its carrier liability ends at its own terminal, and its further liability is merely that of a forwarder. Having this power to make the one or the

other contract, the only question which has occasioned a conflict in the decided cases was whether it, in the particular case, made the one or the other.

The general doctrine accepted by this court, in the absence of legislation, is, that a carrier, unless there be a special contract, is only bound to carry over its own line and then deliver to a connecting carrier. That such an initial carrier might contract to carry over the whole route was never doubted. It is equally indisputable that if it does so contract, its common-law carrier liability will extend over the entire route. *Railway* v. *McCarthy,* 96 U. S. 258, 266; *Railroad* v. *Pratt,* 22 Wall. 123; *Railroad* v. *American Trading Co.,* 195 U. S. 439; *Muschamp* v. *Lancaster Railway Co.,* 8 M. & W. 421.

The English cases beginning with *Muschamp* v. *Lancaster Railway Company,* 8 M. & W. 421, decided in 1841, down to *Bristol &c. Railway* v. *Collins,* 7 H. L. Cases, 194, have consistently held that the mere receipt of property for transportation to a point beyond the line of the receiving carrier, without any qualifying agreement, justified an inference of an agreement for through transportation and an assumption of full carrier liability by the primary carrier. The ruling is grounded upon considerations of public policy and public convenience, and classes the receipt of goods so designated for a point beyond the carrier line as a holding out to the public that the carrier has made its own arrangements for the continuance by a connecting carrier of the transportation after the goods leave its own line. There are American cases which take the same view of the question of evidence thus presented. Some of them are *Railroad* v. *Campbell,* 7 Heisk. (Tenn.) 257; *Railroad* v. *Mt. Vernon. Co.,* 84 Alabama, 175; *Railroad* v. *Hasselkus,* 91 Georgia, 384; *Beard* v. *Railroad,* 79 Iowa, 531; *Kyle* v. *Railroad,* 10 Rich. (S. C.) 382; *Railroad* v. *Wilcox,* 84 Illinois, 240; *Railroad* v. *Rogers & Hartsell,* 6 Heisk. (Tenn.) 143.

Upon the other hand, many American courts have repudiated the English rule which holds the carrier to a contract for transportation over the whole route, in the absence of a contract clearly otherwise, and have adopted the rule that unless the carrier specifically agrees to carry over the whole route its responsibility, as a carrier, ends with its own line, and that for the continuance of the shipment its liability is only that of a forwarder. The conflict has, therefore, been one as to the evidence from which a contract for through carriage to a place beyond the line of the receiving carrier might be inferred.

In this conflicting condition of the decisions as to the circumstances from which an agreement for through transportation of property designated to a point beyond the receiving carrier's line might be inferred, Congress by the act here involved has declared, in substance, that the act of receiving property for transportation to a point in another State and beyond the line of the receiving carrier shall impose on such receiving carrier the obligation of through transportation with carrier liability throughout. But this uncertainty of the nature and extent of the liability of a-carrier receiving goods destined to a point beyond its own line was not all which might well induce the interposition of the regulating power of Congress. Nothing has perhaps contributed more to the wealth and prosperity of the country than the almost universal practice of transportation companies to coöperate in making through routes and joint rates. Through this method a situation has been brought about by which, though independently managed, connecting carriers become in effect one system. This practice has its origin in the mutual interests of such companies and in the necessities of an expanding commerce.

In the leading case of *Muschamp* v. *Lancaster Railway Company*, cited above, Lord Abinger defended the inference of a contract for through carriage from the mere

receipt of a package destined to a point beyond the line of the receiving carrier upon the known practice in his day of such carriers. Upon this subject, in speaking of connecting lines of railway, he said: "These railway companies, though separate in themselves, are in the habit, for their own advantage, of making contracts, of which this was one, to convey goods along the whole line, to the ultimate terminus, each of them being agents of the other to carry them forward, and each receiving their share of the profits from the last."

The tenth clause of the conditions annexed to this bill of lading, and shown elsewhere, affords a fair illustration of the customary methods of connecting carriers to co-operate for their mutual benefit in carrying on transportation begun by one which must be continued by other lines over which the thing to be transported must go. The receiving carrier makes the rate and the route, and as the agent of every such connecting carrier executes a contract which is to bind each of them, "severally, but not jointly," one of the terms of the agreement being that each carrier shall be liable only for loss or damage occurring on its own line. Through this well known and necessary practice of connecting carriers there has come about, without unity of ownership or physical operation, a singleness of charge and a continuity of transportation greatly to the advantage of the carrier and beneficial to the great and growing commerce of the country.

Along with this singleness of rate and continuity of carriage there grew up the practice by receiving carriers, illustrated in this case, of refusing to make a specific agreement to transport to points beyond its own line, whereby the connecting carrier for the purpose of carriage would become the agent of the primary carrier. The common form of receipt, as the court may judicially know, is one by which the shipper is compelled to make with each carrier in the route over which his package

must go a separate agreement limiting the carrier lia-
bility of each separate company to its own part of the
through route. As a result the shipper could look only
to the initial carrier for recompense for loss, damage or
delay occurring on its part of the route. If such primary
carrier was able to show a delivery to the rails of the next
succeeding carrier, although the packages might and
usually did continue the journey in the same car in which
they had been originally loaded, the shipper must fail
in his suit. He might, it is true, then bring his action
against the carrier so shown to have next received the
shipment. But here, in turn he might be met by proof
of safe delivery to a third separate carrier. In short, as
the shipper was not himself in possession of the informa-
tion as to when and where his property had been lost or
damaged and had no access to the records of the connect-
ing carriers who in turn had participated in some part of
the transportation, he was compelled in many instances
to make such settlement as should be proposed.

This burdensome situation of the shipping public in ref-
erence to interstate shipments over routes including sepa-
rate lines of carriers was the matter which Congress under-
took to regulate. Thus when this Carmack amendment
was reported by a conference committee, Judge William
Richardson, a Congressman from Alabama, speaking for
the committee of the matter which it was sought to rem-
edy, among other things, said:

"One of the great complaints of the railroads has been
—and, I think, a reasonable, just and fair complaint—
that when a man made a shipment, say, from Washing-
ton, for instance, to San Francisco, Cal., and his ship-
ment was lost in some way, the citizen had to go thousands
of miles, probably, to institute his suit. The result was
that he had to settle his damages at what he could get.
What have we done? We have made the initial carrier,
the carrier that takes and receives the shipment, respon-

sible for the loss of the article in the way of damages. We save the shipper from going to California or some distant place to institute his suit. Why? The reasons for inducing us to do that were that the initial carrier has a through route connection with the secondary carrier, on whose route the loss occurred, and a settlement between them will be an easy matter, while the shipper would be at heavy expense in the institution of a suit. If a judgment is obtained against the initial carrier, no doubt exists but that the secondary carrier would pay it at once. Why? Because the arrangement, the concert, the coöperation, the through route courtesies between them would be broken up if prompt payment were not made. We have done that in conference." (Cong. Rec. Pt. 10, p. 9580.)

It must be conceded that the effect of the act in respect of carriers receiving packages in one State for a point in another and beyond its own lines, is to deny to such an initial carrier the former right to make a contract limiting liability to its own line. This it is said is a denial of the liberty of contract secured by the Fifth Amendment to the Constitution. To support this counsel cite such cases as *Allgeyer* v. *Louisiana,* 165 U. S. 589; *Lochner* v. *New York,* 198 U. S. 45, and *Adair* v. *United States,* 208 U. S. 161.

This power to regulate is the right to prescribe the rules under which such commerce may be conducted. "It is," said Chief Justice Marshall, in *Gibbons* v. *Ogden,* 9 Wheat. 1, 197, "a power vested in Congress as absolutely as it would be in a single government having in its constitution the same restrictions on the exercise of the power as are found in the Constitution of the United States." It is a power which extends to the regulation of the appliances and machinery and agencies by which such commerce is conducted. Thus in *Johnson* v. *Southern Pac. Ry.,* 196 U. S. 1, an act prescribing safety ap-

pliances was upheld. And in *Interstate Commerce Commission* v. *Illinois Central R. R. Co.*, 215 U. S. 452, it was held that the equipment of an interstate railway, including cars used for the transportation of its own fuel, was subject to the regulation of Congress. In *Interstate Commerce Commission* v. *C. & A. Ry. Co.*, 215 U. S. 479, it was held to extend to the distribution of coal cars to the shipper, so as to prevent discrimination. In *The Employers' Liability Cases*, 207 U. S. 463, 495, power to pass an act which regulated the relation of master and servant, so as to impose on the carrier, while engaged in interstate commerce, liability for the negligence of a fellow-servant, for which at common law there was no liability, and depriving such carrier of the common-law defense of contributory negligence save by way of reduction of damages, was upheld. In *Addyston Pipe Co.* v. *United States*, 175 U. S. 211, and *Northern Securities Co.* v. *United States*, 193 U. S. 197, it was held that this power of regulation extended to and embraced contracts in restraint of trade between the States.

It is obvious, from the many decisions of this court, that there is no such thing as absolute freedom of contract. Contracts which contravene public policy cannot be lawfully made at all, and the power to make contracts may in all cases be regulated as to form, evidence, and validity as to third persons. The power of government extends to the denial of liberty of contract to the extent of forbidding or regulating every contract which is reasonably calculated to injuriously affect the public interests. Undoubtedly the United States is a government of limited and delegated powers, but in respect of those powers which have been expressly delegated, the power to regulate commerce between the States being one of them, the power is absolute except as limited by other provisions of the Constitution itself.

Having the express power to make rules for the con-

duct of commerce among the States, the range of Congressional discretion as to the regulation best adapted to remedy a practice found inefficient or hurtful, is a wide one.  If the regulating act be one directly applicable to such commerce, not obnoxious to any other provision of the Constitution, and reasonably adapted to the purpose by reason of legitimate relation between such commerce and the rule provided, the question of power is foreclosed.  "The test of power," said Mr. Justice White, speaking for this court in the *Employers' Liability Cases*, cited above, "is not merely the matter regulated, but whether the regulation is directly one of interstate commerce, or is embraced within the grant conferred on Congress to use all lawful means necessary and appropriate to the execution of the power to regulate commerce."

That a situation had come about which demanded regulation in the public interest was the judgment of Congress.  The requirement that carriers who undertook to engage in interstate transportation, and as a part of that business held themselves out as receiving packages destined to places beyond their own terminal, should be required as a condition of continuing in that traffic to obligate themselves to carry to the point of destination, using the lines of connecting carriers as their own agencies, was not beyond the scope of the power of regulation. The rule is adapted to secure the rights of the shipper by securing unity of transportation with unity of responsibility.  The regulation is one which also facilitates the remedy of one who sustains a loss, by localizing the responsible carrier.  Neither does the regulation impose an unreasonable burden upon the receiving carrier.  The methods in vogue, as the court may judicially know, embrace not only the voluntary arrangement of through routes and rates, but the collection of the single charge made by the carrier at one or the other end of the route. This involves frequent and prompt settlement of traffic

balances. The routing in a measure depends upon the certainty and promptness of such traffic balance settlements, and such balances have been regarded as debts of a preferred character when there is a receivership. Again, the business association of such carriers affords to each facilities for locating primary responsibility as between themselves which the shipper cannot have. These well-known conditions afford a reasonable security to the receiving carrier for a reimbursement of a carrier liability which should fall upon one of the connecting carriers as between themselves.

But, it is said, that any security resulting from a voluntary agreement constituting a through route and rate is destroyed if the receiving carrier is not at liberty to select his own agencies for a continuance of the transportation beyond his own line. This is an objection which has no application to the present case. This action was for loss and damage arising from several distinct shipments to different places beyond the line of the plaintiff in error who was the initial or receiving carrier. The presumption from the absence of anything to the contrary in the record is that the routing was over connecting lines with whom the plaintiff in error had theretofore made its own arrangements and rate. This record presents no question as to the right of the initial carrier to refuse a shipment designated for a point beyond its own line, nor its right to refuse to make a through route or joint rate when such route and rate would involve the continuance of a transportation over independent lines. We, therefore, refrain from any consideration of the large question thus suggested. The shipments involved in the present case were voluntarily received by an initial carrier who undertook to escape carrier's liability beyond its own line by a provision limiting liability to loss upon its own line. This was forbidden by the Carmack amendment and any stipulation and condition in the

special receipt which contravenes the rule in question is invalid.

Reduced to the final results, the Congress has said that a receiving carrier, in spite of any stipulation to the contrary, shall be deemed, when it receives property in one State to be transported to a point in another involving the use of a connecting carrier for some part of the way, to have adopted such other carrier as its agent, and to incur carrier liability throughout the entire route, with the right to reimbursement for a loss not due to his own negligence. The conditions which justified this extension of carrier liability we have already adverted to. The rule of the common law which treated a common carrier as an insurer grew out of a situation which required that kind of security for the protection of the public. To quote the quaint but expressive words of Lord Holt, in *Coggs* v. *Bernard*, 2 Ld. Raymond, 909, when defending and appying the doctrine of absolute liability against loss not due to the act of God or the public enemy, "this rule," said he, "is a politick establishment contrived by the policy of the law for the safety of all persons, the necessity of whose affairs oblige them to trust these sort of persons that they may be safe in their ways of dealing."

If it is to be assumed that the ultimate power exerted by Congress is that of compelling coöperation by connecting lines of independent carriers for purposes of interstate transportation, the power is still not beyond the regulating power of Congress, since without merging identity of separate lines or operation it stops with the requirement of oneness of charge, continuity of transportation and primary liability of the receiving carrier to the shipper, with the right of reimbursement from the guilty agency in the route. That there is some chance that this right of recoupment may not be always effective may be conceded without invalidating the regulation. If the

power existed and the regulation is adapted to the purpose in view, the public advantage justifies the discretion
exercised and upholds the legislation as within the limit
of the grant conferred upon Congress. Touching the
range of legislative discretion of the States in respect to
occupations or trades which are affected by a public use,
this court, in *Gundling* v. *Chicago*, 177 U. S. 183, 188, said:

"Unless the regulations are so utterly unreasonable and
extravagant in their nature and purpose that the property and personal rights of the citizen are unnecessarily,
and in a manner wholly arbitrary, interfered with or destroyed without due process of law, they do not extend,
beyond the power of the State to pass, and they form no
subject for Federal interference. As stated in *Crowley* v.
*Christensen*, 137 U. S. 86, 'the possession and enjoyment
of all rights are subject to such reasonable conditions as
may be deemed by the governing authority of the country essential to the safety, health, peace, good order and
morals of the community.'"

But it is said that the act violates the Fifth Amendment by taking the property of the initial carrier to pay
the debt of an independent connecting carrier whose negligence may have been the sole cause of the loss. But
this contention results from a surface reading of the act
and misses the true basis upon which it rests. The liability of the receiving carrier which results in such a case
is that of a principal for the negligence of his own agents.

In substance Congress has said to such carriers, "If
you receive articles for transportation from a point in
one State to a place in another, beyond your own terminal, you must do so under a contract to transport to
the place designated. If you are obliged to use the services of independent carriers in the continuance of the
transit, you must use them as your own agents and not
as agents of the shipper." It is, therefore, not the case
of making one pay the debt of another. The receiving

carrier is, as principal, liable not only for its own negligence, but for that of any agency it may use, although, as between themselves, the company actually causing the loss may be primarily liable

· In *Seaboard Air Line* v. *Seegers*, 207 U. S. 73, 78, legislation by the State of Georgia imposing a penalty on common carriers for failure to adjust damage claims within forty days was held to neither deny due process nor the equal protection of the law. Speaking by Mr. Justice Brewer, the court said of the reasonableness of the requirement and classification, that "the matter to be adjusted is one peculiarly within the knowledge of the carrier. It receives the goods and has them in its custody until the carriage is completed. It knows what it received and what it delivered. It knows what injury was done during the shipment and how it was done. The consignee may not know what was in fact delivered at the time of the shipment, and the shipper may not know what was delivered to the consignee at the close of the transportation. The carrier can determine the amount of the loss more accurately and promptly and with less delay and expense than anyone else, and for the adjustment of loss or damage to shipments within the State forty days cannot be said to be an unreasonably short length of time."

The conclusion we reach in respect to the validity of the amendment has the support of some well-considered cases. Among them we cite: *Smeltzer* v. *Railroad*, 158 Fed. Rep. 649; *Railroad* v. *Mitchell*, 91 N. E. Rep. 735; *Railroad* v. *Scott*, 118 S. W. Rep. 992.

The judgment included an attorney's fee taxed as part of the costs. The authority for this is supposed to be found in the eighth section of the act to regulate commerce of February 4, 1887, chap. 104, § 8 (24 Stat. at Large, p. 379, 382). The section reads as follows:

"That in case any common carrier subject to the pro-

visions of this act shall do, cause to be done, or permit to be done any act, matter, or thing in this act prohibited or declared to be unlawful, or shall omit to do any act, matter, or thing in this act required to be done, such common carrier shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of any such violation of the provisions of this act, together with a reasonable counsel or attorney's fee, to be fixed by the court in every case of recovery, which attorney's fee shall be taxed and collected as part of the costs of the case."

But that section applies to cases where the cause of action is the doing of something made unlawful by some provision of the act, or the omission to do something required by the act, and there is a recovery "of damages sustained in consequence of any such violation of this act," etc. The cause of action in the present case is not for damages resulting from "any violation of the provisions of this act." True, the plaintiff in error attempted by contract to stipulate for a limitation of liability to a loss on its own line, and in this action has defensively denied liability for a loss not occurring on its own line. But the cause of action was the loss of the plaintiff's property which had been entrusted to it as a common carrier, and that loss is in no way traceable to the violation of any provision of the act to regulate commerce. Having sustained no damage which was a consequence of the violation of the act, the section has no application to this case.

The judgment was erroneous to this extent, and the provision for an attorney's fee is stricken out, and the judgment thus modified is

                                          *Affirmed.*