264 So.2d 646

**FRISCHHERTZ ELECTRIC COMPANY, Inc.**

v.

**STRICKLAND TRANSPORTATION COMPANY, Inc., and Transport Insurance Company, Inc.**

No. 51687.

June 29, 1972.

Herman & Herman, Mark B. Herman, New Orleans, for plaintiff-applicant.

White, Fray & White, Robert H. Fray, Gretna, for defendants-respondents.

SANDERS, Justice:

We granted certiorari to review a judgment of the Court of Appeal denying Frischhertz Electric Company, Inc., recovery against a common carrier for damage to a quantity of batteries shipped from New York to Louisiana.[1] We reverse and remand the case to the Court of Appeal for the assessment of damages.

On September 11, 1968, Frischhertz placed an order with a New Orleans supplier for eight NC–30 cadmium batteries and accompanying charging units. The battery manufacturer was Lightalarms Electronics Corporation of Brooklyn, New York. By a bill of lading dated September 16, 1968, Lightalarms directed Strickland Transportation Company, Inc., the defendant, to deliver the electrical transformers and "4 cartons wet batteries, white label" to Frischhertz at its job site in Arabi, Louisiana. The carrier made no notation of damage on the bill of lading.

On October 2, 1968, Strickland delivered the shipment. When Frischhertz received the batteries, they were in three cartons, instead of four. Both the truck driver and

1. La.App., 250 So.2d 236; Writ granted, 259 La. 804, 253 So.2d 65.

the Frischhertz foreman observed dampness and leakage on two of the cartons. The truck driver noted on the delivery receipt that two cartons were leaking.

The following day, a Lightalarms representative inspected the shipment. He found that two of the cartons were damaged. Moreover, the batteries were not in the containers customarily used by Lightalarms. Instead, they were in non-regulation cartons that failed to meet the wet-battery packaging regulations of the Interstate Commerce Commission.

On October 9, Frischhertz asked Strickland to inspect the damage and make restitution. Following an investigation, the Strickland inspector reported that the batteries had been "recoopered-new cartons" and that they were damaged.

When Strickland and its insurer failed to pay the loss, Frischhertz brought this action for the replacement cost of the batteries in the sum of $818.79, plus interest, penalties, and costs.

The Court of Appeal noted that, although Strickland was listed as the carrier, the name "H. & R. Trucking Co." was stamped on the bill of lading below the description of the articles. The court then held:

"Defendant denied receiving the merchandise in Brooklyn in it answer, and

the bill of lading does not prove this point. We are convinced that the plaintiff should have explained how H & R Trucking Company fits into the picture and this it failed to do. The three points of transfer en route raises the possibility that another carrier was involved, particularly since another firm is noted on the bill of lading. The record does reflect Strickland transferred the merchandise at New Orleans from one truck to another but the third transfer is not explained.

"We are of the opinion that the plaintiff was required to clarify or explain these questions to meet its burden of proof and this it failed to do." [2]

We disagree. Assuming that the unexplained name on the bill of lading is evidence that another carrier transported the batteries initially, this circumstances does not defeat recovery.

The Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.A. § 20(11) provides in part:

[A]*ny common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon,* whether such receipt or bill of lading has been issued or not, *for the full actual loss,*

2. Judge Gulotta dissented.

*damage, or injury to such property caused by it or by any such common carrier*, railroad, or transportation company *to which such property may be delivered or over whose line or lines such property may pass* within the United States or within an adjacent foreign country when transported on a through bill of lading, notwithstanding any limitation of liability or limitation of the amount of recovery or representation or agreement as to value in any such receipt or bill of lading, or in any contract, rule, regulation, or in any tariff filed with the Interstate Commerce Commission . . . [Italics ours].[3]

■ Under the statute, the delivering carrier is liable to the consignee for shipment damage, irrespective of how many carriers transported the shipment at earlier stages. The statute wisely dispenses with any requirement that the consignee allocate the fault among connecting carriers. It allows him to look to the delivering carrier for his full loss. Bancroft v. Yazoo & M. V. R. Co., 194 La. 115, 193 So. 481 (1939); 14 Am.Jur.2d, Carriers § 706, pp. 201–202.

■ Since Strickland admittedly delivered the shipment, plaintiff is entitled to restitution from it, if the burden of proof has been otherwise satisfied.

3. See also 49 U.S.C.A. § 319, making this section specifically applicable to common carriers by motor vehicle.

■ The law is well established that, in order to recover for carrier damage, the consignee must prove the following: (1) Receipt of goods by the initial carrier in good condition; (2) Arrival in damaged condition; and (3) The amount of the loss. Missouri P. R. Co. v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L. Ed.2d 194 (1964); Yuspeh v. Acme Fast Freight, 222 La. 747, 63 So.2d 743 (1953); Bancroft v. Yazoo & M. V. R. Co., supra.

■ Although defendants in their brief deny that plaintiff has borne the burden of proof as to any of the elements of liability, we conclude that the only substantial question is whether plaintiff has established the receipt of the equipment by the carrier in good condition. As to this element, plaintiff offered the bill of lading.[4]

The bill of lading is a standard form. It bears the name of the shipper, Light-alarms, and lists Strickland as the carrier. It contains no notation of damages or exceptions made by the receiving carrier.

We hold that the clean bill of lading is sufficient to establish *prima facie* that the carrier received the four cartons in good condition. By *good condition*, we mean that the cartons were free of defects or damage that would be disclosed by ordinary inspection.

4. A copy of the bill of lading was used without objection.

The applicable rule is correctly set forth in 14 Am.Jur.2d, Carriers § 619, p. 133 as follows:

" . . . [I]t is generally held that issuance of a bill of lading or shipping receipt without a notation thereon of *visible* damages or defects in the shipment creates a presumption that, insofar as is disclosed by ordinary inspection, the shipment was free from visible defects or damages and, to such extent, in good condition when received by the carrier. Moreover, the issuance by a carrier of a bill of lading or shipping receipt which, containing no notation of visible damages or defects, includes an affirmative acknowledgement that on receipt the goods to be shipped were in "good order" or "apparent good order," has been generally held to constitute prima facie evidence that the goods were received in good condition, at least with respect to external matters."

See also Annot., Evidence—Carrier of Freight—Damage, 33 A.L.R.2d 867, 870 (1954).

In the present case, the batteries arrived in three non-regulation cartons. Two had visible damage. Obviously, if these conditions had existed at the point of shipment, they probably would have been noted and exceptions made. Hence, the clean bill of lading is sufficient to prove *prima facie* that no such conditions existed

when the carrier received the shipment and to place upon the carrier the burden of going forward with the evidence, if it is to exonerate itself. See Goldberg v. New York, N. H. & H. R. Co., 130 Me. 96, 153 A. 812 (1931); Minneapolis Fire & Marine Ins. Co. v. Baltimore & Ohio R. Co., 237 Minn. 111, 53 N.W.2d 828, 33 A.L.R.2d 860 (1952).

In Minneapolis Fire & Marine Ins. Co. v. Baltimore & Ohio R. Co., the Minnesota Supreme Court stated:

"Damages to or defects in a shipment obvious at the point of destination would be equally apparent at the point of shipment if then existent. The issuance of a receipt for such a shipment at the latter point without any notation of visible defects thereon would indicate the absence of such defects at that time. It would follow that if the shipment were visibly damaged upon arrival at the point of destination such damage must have been sustained in transit. Schwalb v. Erie R. Co., 161 Misc. 743, 293 N.Y.S. 842. This conclusion is strengthened by the fact that a carrier has the right to refuse to accept merchandise not properly packaged or crated, 9 Am.Jur., Carriers, § 299, and, under normal circumstances, would either refuse such a shipment or note on the receipt therefor any damages or defects plainly visible therein."

The carrier offered no evidence here tending to show that the batteries were damaged at the time of shipment. It did not negate plaintiff's *prima facie* case. Hence, the plaintiff is entitled to recover the damages sustained.

Since the Court of Appeal has not passed upon the amount of damages, we remand the case to the Court of Appeal for their determination in accordance with our usual practice. See Felt v. Price, 240 La. 966, 126 So.2d 330 (1961) and the authorities therein cited.

For the reasons assigned, the judgment of the Court of Appeal is reversed and judgment is rendered in favor of plaintiff, Frischhertz Electric Company, Inc., and against the defendants, Strickland Transportation Company, Inc., and Transport Insurance Company, Inc., in solido, in such sum as may hereafter be fixed. The case is remanded to the Court of Appeal for the assessment of damages. All costs of this appeal are taxed against the defendants.

HAMLIN, Justice (dissenting).

I am compelled to respectfully dissent from the majority opinion. Under the facts and circumstances of the instant case, I do not believe that the delivering carrier, Strickland Transportation Company, Inc., is liable to the consignee, Frischhertz Electric Company, Inc., for shipment damage.

The facts of record disclose that the instant cadmium batteries were ordered by plaintiff and shipped from Lightalarms Electronics Corporation located in Brooklyn, New York. They were delivered to plaintiff's job site in Arabi, Louisiana on October 2, 1968, and at the time of delivery, Frischhertz's foreman and Strickland's driver noted that least two of the cardboard cartons of batteries showed visible signs of damage by water marks on the outside of the boxes. Examination of the batteries revealed that some of them were damaged. I find that there was damage; the preponderance of the evidence is to that effect. The manufacturer's warranty ceased to exist, and plaintiff was compelled to order new batteries for the construction project on which it was working. The amount paid for the new batteries represents the replacement costs sought by plaintiff in this suit.

The trial court dismissed plaintiff's suit, finding that it failed to prove its case by a preponderance of the evidence. The Court of Appeal found that Frischhertz failed to clarify or explain certain questions required to meet its burden of proof; it agreed with the result reached by the trial court and affirmed its judgment. I agree with the findings of the two lower courts.

The instant bill of lading recites that it was issued in Brooklyn, New York, September 16, 1968, from Lightalarms Electronics Corporation, and the merchandise was consigned to and destined to Frischhertz, Arabi Park School Job, Arabi, Lou-

isiana; the merchandise is enumerated as six cartons of electric fixtures, transformers, and four cartons/crates of wet batteries, white label. The shipper's number is recited "W 23430." The bill has the following notation stamped on it: "To H & R Trucking Co." Strickland's name appears as the carrier. The bill contains no notation as to the condition of the merchandise.[1]

The liability vel non of Strickland is predicated upon the Carmack Amendment, Sec. 20(11) of the Interstate Commerce Act, 49 U.S.C.A. Sec. 20(11) which recites in part:

> " * * * any common carrier, railroad, or transportation company delivering said property so received and transported shall be liable to the lawful holder of said receipt or bill of lading or to any party entitled to recover thereon, whether such receipt or bill of lading has been issued or not, for the full actual loss, damage, or injury to such property caused by it or by any such common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass within the United States * * *"

The following jurisprudence is applicable to a discussion of the Carmack Amendment:

> "At common law a common carrier undertook to carry the shipment safely, and it was liable for all loss or injury excepting only that due to acts of God, public enemy, and those arising from the inherent nature of the goods transported or resulting from the fault of the shipper. It was also a rule of common law that as to these excepted causes of damage the carrier could nevertheless be held liable if it were negligent. The carrier was liable for damages whether negligent or not if the loss was not due to the excepted causes. Therefore a carrier could not escape liability by a showing of the absence of negligence on its part. Chesapeake & Ohio Ry. Co. v. Thompson Mfg. Co., 270 U.S. 416, 46 S. Ct. 318, 70 L.Ed. 659.

> "In Secretary of Agriculture v. United States, 350 U.S. 162, 76 S.Ct. 244, 100 L.Ed. 173, the Court considered a similar question and found that the Interstate

---

1. The Court of Appeal stated: "Defendant denied receiving the merchandise in Brooklyn in its answer, and the bill of lading does not prove this point. We are convinced that the plaintiff should have explained how H & R Trucking Company fits into the picture and this it failed to do. The three points of transfer en route raises the possibility that another carrier was involved, particularly since another firm is noted on the bill of lading. The record does reflect Strickland transferred the merchandise at New Orleans from one truck to another but the third transfer is not explained." 250 So.2d at p. 238.

Commerce Commission was prevented from approving tariffs which limited the common law liability of the carrier for damage. It has been held that a prima facie case has been made under the Carmack Amendment when the shipper shows that the shipment was in good condition when delivered to the carrier and further that the carrier could not escape liability if the goods are delivered in damaged condition, by showing that it was not negligent in handling the shipment. Thus the Carmack Amendment codifies the common law rule of the carrier's liability, and the federal law applies * * *"

L. E. Whitlock Truck Service, Inc. v. Regal Drilling Co., 10th Cir., 333 F.2d 488, 491 (1964).

"It is settled that the Carmack Act is constitutional, Atlantic Coast Line v. Riverside Mills, 219 U.S. 186, 31 S.Ct. 164, 55 L.Ed. 167 (1911), that it supersedes any state legislation on the same subject, Adams Express Co. v. Croninger, 226 U.S. 491, 33 S. Ct. 148, 57 L.Ed. 314 (1913) and that any 'rule, regulation, or other limitation of any character whatsoever' purporting to limit its effect are by its terms declared null and void, Missouri Pacific R. R. v. Elmore and Stahl, 377 U.S. 134, 136, 137, 84 S.Ct. 1142, 1144, 12 L.Ed.2d 194 (1964).

"* * *

"* * * Thus, in addition to codifying the common-law rule of liability, the Car-mack Amendment was enacted to eliminate from a shipper's burden of proof the often insurmountable hurdle of demonstrating damage at the hands of a specific carrier. N. Y. Philadelphia & Norfolk R. Co. v. Peninsula Produce Exchange, 240 U.S. 34, 37, 36 S.Ct. 230, 60 L.Ed. 511 (1916). As we said in *Whitlock, supra,* 10th Cir., 333 F.2d at 490, 'its principal function is to *permit* a shipper in interstate commerce to bring an action against the initial carrier to recover for damages to the shipment whether such damages occurred while the goods were in the hands of the initial carrier or connecting carriers.'" Litvak Meat Company v. Baker, 10th Cir., 446 F.2d 329 (1971).

"The parties agree that the liability of a carrier for damage to an interstate shipment is a matter of federal law controlled by federal statutes and decisions. The Carmack Amendment of 1906, § 20(11) of the Interstate Commerce Act, makes carriers liable 'for the full actual loss, damage, or injury * * * caused by' them to property they transport, and declares unlawful and void, any contract, regulation, tariff, or other attempted means of limiting this liability. It is settled that this statute has two undisputed effects crucial to the issue in this case: First, the statute codifies the common-law rule that a carrier, though not an absolute insurer, is liable for damage to goods transported by it unless it can show that the damage was

caused by '(a) the act of God; (b) the public enemy; (c) the act of the shipper himself; (d) public authority; (e) or the inherent vice or the nature of the goods.' Bills of Lading, 52 I.C.C. 671, 679; Chesapeake & O. Ry. Co. v. A. F. Thompson Mfg. Co., 270 U.S. 416, 421–423, 46 S.Ct. 318, 319–320, 70 L.Ed. 659; Adams Express Co. v. Croninger, 226 U.S. 491, 509, 33 S.Ct. 148, 153, 57 L.Ed. 314; Hall & Long v. Railroad Companies, 13 Wall. 367, 372, 20 L.Ed. 594. Second, the statute declares unlawful and void any 'rule, regulation, or other limitation of any character whatsoever' purporting to limit this liability. See Cincinnati N. O. & Texas Pac. R. Co. v. Rankin, 241 U.S. 319, 326, 36 S.Ct. 555, 557–558, 60 L.Ed. 1022; Boston & M. R. R. v. Piper, 246 U.S. 439, 445, 38 S.Ct. 354, 355, 62 L.Ed. 820. Accordingly, under federal law, in an action to recover from a carrier for damage to a shipment, the shipper establishes his prima facie case when he shows delivery in good condition, arrival in damaged condition, and the amount of damages. Thereupon, the burden of proof is upon the carrier to show both its freedom from negligence and that the damage to the cargo was due to one of the excepted causes relieving the carrier of liability. Galveston, H. & S. A. R. Co. v. Wallace, 223 U.S. 481, 492, 32 S.Ct. 205, 207, 56 L.Ed. 516; Chicago & E. I. R. Co. v. Collins Co., 249 U.S. 186, 191, 39 S.Ct.

189, 190, 63 L.Ed. 552; Chesapeake & O. Ry. Co. v. A. F. Thompson Mfg. Co., 270 U.S. 416, 420–423, 46 S.Ct. 318, 319–320, 70 L.Ed. 659; Thompson v. James G. McCarrick Co., 5 Cir., 205 F.2d 897, 900." Missouri Pacific Railroad Company v. Elmore & Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L.Ed.2d 194 (1964).

It is my view that, in order for Frischhertz to recover herein, it is mandatory under the Carmack Amendment and the jurisprudence that it prove:

1. *Delivery* to or receipt by the carrier of the *cargo in good condition.*

2. Arrival of the cargo in damaged condition.

3. The amount of damages suffered.

I find that Frischhertz has not met the burden of proof required by No. 1. The instant bill of lading, described supra, is unrevealing, and plaintiff offered no evidence of the *good condition of the batteries* at the time of their delivery to the carrier.

The instant batteries shipped from New York were a type of merchandise which required particular caution in packaging and transporting. Their character is intricate, delicate, technical, and variable. Louis Harris, an employee of David B. Young Sales Company, New Orleans, Louisiana, and an expert for electrical power devices, including knowledge of batteries,

testified in part with respect to the batteries as follows:

"Q. Now, Mr. Harris, regarding the batteries such as this nickel cadmium, NC30, what type of damage is caused to a battery such as this when the fluid is allowed to go below the lower red line?

"A. The plates of the batteries are exposed, and when they are exposed under charge, the plate breaks down, directly.

"Q. Now, when you say exposed under charge, what does that mean?

"A. When the battery is filled with an electrolyte material and has been placed on a battery charger to bring it up to its proper rate of charge.

"Q. Now, regarding this type of battery, can damage result to these batteries if they come in contact with other batteries where leakage or spillage has occurred?

"A. Yes.

"Q. In what way can those batteries be damaged?

"A. The upper portion of the battery can be acid-eaten in such a way that it no longer makes proper contact or there is a proper flow between the contacts.

"Q. Now, has it been your experience as a representative of Light Alarms that when leakage or damage occurs to batteries from the time they leave the factory or their origin, their place of origin, wherever it may be, to arrival time, has it been their practice to warrant the fitness of these batteries?

"A. Rephrase that, please?

"Q. I may have confused you a little bit. Has it been the policy of Light Alarms to perpetuate the warranty or guaranty on these batteries when spillage or leakage has occurred or when batteries have come in contact with other units which have had spillage or leakage?

"A. The batteries are no longer warranted if they have come under contact with spillage from other batteries.

"Q. So, it's quite possible, then, that a battery which appears to be full, I mean, up to the top red line, here, (indicating) may still be damaged as a result of a spillage or leakage from other batteries, is that correct?

"A. That's correct."

On cross examination, Mr. Harris testified as follows:

"Q. Mr. Harris, can these batteries be shipped dry?

"A. Can they be shipped dry? Yes.

"Q. Is there any reason to ship them with the fluid in them?

"A. Yes, the matter of economics, primarily, if these batteries are shipped dry, but they are normally shipped in a wet container and placed in a wet container at the factory. This is industry-wide practice.

The type of unit that this type of battery is used in is a really low-cost product. It's a lighting unit that sells for, oh, depending on the unit, for around a hundred dollars, and the batteries involve a cost that is perhaps half of the cost of the total unit.

If they were shipped dry, it would mean that—if the cell was shipped dry, then, it would mean that the electrolyte, if furnished by Light Alarms, would have to be shipped in a separate, sealed container, and then, the electricians on the job site would have to fill these batteries from those containers. This would present a certain amount of hazard, too, to the job site, since it is a caustic material, and the customer prefers not to come in contact with this caustic material."

B. L. Tucker, an employee of David B. Young Sales Company, testified as follows:

"Q. Has it been the policy of the company which you represent to honor warranties and guaranties on batteries when the electrolyte has been reduced or corrosion has resulted to companion batteries in a shipment?

"A. No.

"Q. Why is this?

"A. Well, for reasons previously given by Mr. Harris. This part of the batteries will not last as long, and they will start deteriorating; therefore, the normal guaranty cannot be issued."

Robert Villani, driver for Strickland, testified in part as follows:

"Q. Now, let me ask, if I can rephrase that question and make it a little clearer for you. In your nine years of driving for Strickland or your employment with Strickland, the normal procedure for taking exception to a carton where there is merchandise in the carton is for the recipient to take exception with that carton is [when] there is apparent damage at the time of delivery, is that correct?

"A. Right.

"Q. So, if an item inside that container was not—Excuse me. If a carton showed no apparent or visible damage, it wouldn't be unusual for the recipient not to open it right then, would it, and take exception on it? Would there be any reason for them to take exception on a carton that showed no damage?

"A. No, not to my knowledge.

"Q. So, it's your testimony that normally exceptions are only taken when the cartons—when the containers show damage, is that right, at the time of delivery?

"A. Right, yes, sir.

"Q. And I believe you testified that you can't recall if some cartons were damaged or not, but you do recall that some of the cartons were wet, is that correct?

"A. The amount of cartons that were wet or leaking is the exact amount I gave an exception for.

"Q. Two cartons?

"A. Two cartons."

In Yuspeh v. Acme Fast Freight, 222 La. 747, 63 So.2d 743 (1953), we held that the bill of lading should recite the condition of the merchandise when received for shipment, and in Aetna Insurance Company v. General Terminals Trans. & Stor., Inc., 225 So.2d 72 (1969), the Court of Appeal, Fourth Circuit, stated: " * * * However, where the goods are packed in containers, and where the damage is of a kind that could have been present without being observable from the exterior of the containers at the time the goods were delivered to the carrier, the bill of lading relates only to the external condition of the cargo, i. e., to the containers themselves and not to their contents. Under these circumstances it is incumbent upon the consignee to offer further evidence relative to

the good condition of the contents upon receipt by the carrier. * * * " [2]

Plaintiff submits: "It is interesting to note that the bill of lading filed herein and used without objection by all parties, bears, the printed title of the shipper, Lightalarms, and identifies Strickland as the carrier. If Strickland were not the carrier at the point of origin, then, it would have been impossible for Lightalarms to have known the identity of an intervening carrier at the time the bill of lading was issued." It further submits that, "Based upon the bill of lading filed of record in the Trial Court and stipulated by and between counsel, that it was an identical copy of the original and could be used for all purposes, and that the bill of lading bore no notations or exceptions to the condition of the shipment, fulfills the mandate of the Supreme Court in *Acme* as well as the tests as set down under Carmack Amendment." It relies on the following general principle stated in 14 Am.Jur.2d, Carriers,

2. "A recital in a bill of lading that goods received for transportation were in 'good order and condition,' or 'apparent good order and condition,' or entailing equivalent words, either expressed or implied, while prima facie evidence that as to all things observable and open to inspection the recital is true, neither precludes the carrier from showing that loss or damage subsequently found or arising resulted from a cause not apparent at the time the goods were received, the carrier being so precluded only by a special estoppel, contract, or statute, or from showing the truth in support of any proper defense,

nor does it prevent any party from showing the truth on the issue of condition at the time of receipt in support of an admissible cause of action or defense. In particular, where goods received to be transported are in boxes or packages, and cannot be inspected, a bill of lading acknowledging that they are received in good condition is not evidence as to the actual condition of the goods, but merely as to the condition of the packages in which they are contained." 13 Am.Jur. 2d, Carriers, Sec. 285, Recitals as to condition, pp. 787–788.

Sec. 619, Condition of goods when delivered to carrier, p. 133:

"In an action against a carrier to recover damages for injury or damage to goods during the course of transportation, the plaintiff has the burden of establishing that the goods were delivered to the carrier in good condition. The mere delivery of the goods to the carrier does not raise a presumption that the goods were in good condition when so delivered. However, it is generally held that issuance of a bill of lading or shipping receipt without a notation thereon of *visible* damages or defects in the shipment creates a presumption that, insofar as is disclosed by ordinary inspection, the shipment was free from visible defects or damages and, to such extent, in good condition when received by the carrier. Moreover, the issuance by a carrier of a bill of lading or shipping receipt which, containing no notation of visible damages or defects, includes an affirmative acknowledgement that on receipt the goods to be shipped were in 'good order' or 'apparent good order,' has been generally held to constitute prima facie evidence that the goods were received in good condition, at least with respect to external matters."

The testimony of record, supra, with respect to the character of the instant batteries compels us to include that an observation of the cartons containing the batteries at the time of delivery to the carrier would not have revealed the condition of the batteries. (There is some evidence of record that the batteries were not delivered to plaintiff in their original cartons; there is some evidence of record to the effect that the batteries had been recoopered.) A thorough examination of the batteries immediately before packaging should have been made. Proof of their condition at the time of packaging was required; this condition should have been reflected on the cartons or attachments; it could have been recited on the bill of lading.

The carrier is not an absolute insurer against every loss, Scott County Milling Co. v. Thompson, Mo., 255 S.W.2d 121; thus we conclude that under the instant facts and circumstances—cargo of the nature herein shipped—Strickland is entitled to demand proof greater than that offered by Frischhertz. The instant bill of lading, which as stated supra contains no notation as to the *batteries'* condition, cannot under the instant facts and circumstances suffice as an absolute presumption of the good condition of the batteries when delivered to the carrier.

It is incumbent upon plaintiff to make out a prima facie case of negligence, and such prima facie case of negligence on the part of the carrier (admitting for the sake of this dissent that Strickland was the original carrier) had to be made out by showing that the *batteries*—the goods— were delivered to Strickland in good condition.

"In an action to recover from the defendant carrier for damages to the shipment, plaintiff must, in order to establish a prima facie case, show delivery to the carrier in good condition, arrival in damaged condition and the amount of damages. Missouri Pacific R. R. Co. v. Elmore and Stahl, 377 U.S. 134, 84 S.Ct. 1142, 12 L. Ed.2d 194. As to what is good condition on delivery to the carrier, both parties appear to agree that this means 'suitable shipping conditions', which is defined as follows:

" '(j) "Suitable shipping condition", in relation to direct shipments, means that the commodity, at time of billing, is in a condition which, if the shipment is handled under normal transportation service and conditions, will assure delivery without abnormal deterioration at the contract destination agreed upon between the parties.' 7 C.F.R. § 46.43(j)." S. Strock & Company v. Southern Pacific Company, D.C., 326 F.Supp. 695, 696 (1971).

"A shipper makes out a prima facie case of negligence against a carrier when it is shown that *goods* were delivered to a carrier in good condition and that the carrier delivered them to the consignee in a damaged condition. * * * However, the carrier is ordinarily not liable for acts or defaults of the shipper in loading a car in an improper manner. * * *" Association of Maryland Pilots v. Baltimore & O. R. Co., D.C., 304 F.Supp. 548, 551 (1969). Cf. 67 A.L.R.2d pp. 1023–1076. (Emphasis mine)

I conclude that plaintiff did not make out a prima facie case and did not meet the mandatory provisions of the Carmack Amendment supra. It is difficult at times to bear a burden of proof, Aetna Ins. Co. v. General Terminals Trans. & Stor., Inc., 225 So.2d 72, such as is required under the Carmack Amendment, but as stated supra the carrier is not an absolute insurer, and the receiver of the cargo has to bear certain obligations as to proof. Under the facts of this case, Lightalarms Electronics Corporation was located in Brooklyn, New York—not in a foreign country; it would not have been impossible for its representative to testify or give a deposition. They were not called by plaintiff. I therefore find that plaintiff did not bear its burden of proof.

As stated supra, the instant batteries were in a damaged condition on arrival at plaintiff's project; this finding, however, does not do away with the requirement that Condition No. 1 of the Carmack Amendment, supra, had to be fulfilled.

For the reasons assigned, I respectfully dissent.