And appellants seize upon these words as a basis for claiming that the rate of the tax is to be determined by the act of 1911, and not by the act of 1910. These words are not new. Identically the same words appear in the Tax Law of 1896 (Laws 1896, c. 908), except that the final word of the sentence was then "act" instead of "chapter." They have been continued in the various tax laws since that date. They have always referred to one of the conditions upon which a transfer became taxable, and never to the rate. If there could be any doubt of this before, that doubt was removed when, in 1911, the Legislature by a more scientific arrangement of the language of the law limited section 220 in its application to a consideration of the persons or corporations receiving the transfer and to the cases and conditions under which such transfer became taxable. To dislocate this subdivision from its context and make it applicable to the subject-matter of section 221a, the rate of taxation is sustained by no rule of statutory construction. No contention is made that in this case "the time of the transfer" was other than at the date of death.

The order of the Surrogate's Court of Kings county should be affirmed, with $10 costs and disbursements. All concur.

---

DE WINTER & CO. v. TEXAS CENT. R. CO.

(Supreme Court, Appellate Division, First Department. May 31, 1912.)

1. CARRIERS (§ 177*)—FREIGHT—CONNECTING CARRIERS—LIABILITY.

Under the Carmack Amendment (34 Stat. 584, 595, c. 3591 [U. S. Comp. St. Supp. 1911, p. 1288]), making initial carriers of interstate shipments of freight liable for losses occurring on a connecting line, a carrier which contracted to transport eggs from a point in Texas to New York City under a bill of lading which provided that the cars should be stopped at intermediate points, including a point on the initial line, a junction point, and a point on a connecting line, to receive additions to the shipment, is liable for damage to the shipment, including eggs loaded at the point on the connecting line; one rate being fixed for the entire shipment.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–803; Dec. Dig. § 177.*]

2. CARRIERS (§ 177*)—FREIGHT—CONNECTING LINES—LIABILITY.

Under the Carmack Amendment (34 U. S. St. 584, 595, c. 3591 [U. S. Comp. St. Supp. 1911, p. 1288]), which makes an initial carrier of an interstate shipment liable for loss arising on a connecting line, provision in a bill of lading covering a car load of eggs shipped from a point in Texas to New York City that the car should be stopped at a point on a connecting line to finish loading did not defeat the initial carrier's liability for loss arising beyond its line.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 775–803; Dec. Dig. § 177.*]

Ingraham, P. J., dissenting.

Appeal from Trial Term, New York County.

Action by De Winter & Co. against the Texas Central Railroad Company. From a judgment for plaintiff and from an order denying a new trial, defendant appeals. Affirmed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, CLARKE, SCOTT, and DOWLING, JJ.

Dickinson W. Richards, of New York City, for appellant.
Francis A. Winslow, of New York City, for respondent.

McLAUGHLIN, J. [1] In July, 1909, A. B. Patterson & Co., plaintiff's assignors, shipped at Stamford, Tex., on the line of defendant's railroad 129 cases of eggs consigned to themselves in New York. At the time of the shipment, a bill of lading, signed by the defendant's agent at Stamford, was delivered to the shipper. So much of the bill of lading as is material to the question to be considered reads as follows:

"Texas Central Railroad.

"Received * * * at Stamford, Texas, July 6th, 1909, from A. B. Patterson & Co. the property described below, in apparent good order. * * *

"The Rate of Freight from Stamford to New York 120 is in Cents per 100 Lbs. * * *

"Consigned to A. B. Patterson & Co.

"Destination, New York, State of N. Y. * *

"Route, T. C. Car M. K. & T. at Waco     Car Initial P. F. E.
                                        Car No. 2514 * * *

1. Car Eggs in Patent carriers
129 Cases loaded at Stamford
Stop at Greenville, Dublin, Waco, to Finish
Loading.  Put in 2000 lbs. Ice at
Dublin

"A. B. Patterson & Co. Shipper.          Geo. Buckingham Agent.
"Per Boyd Shofner Per. "

Dublin was on the defendant railroad, Waco was at the junction of it with the Missouri, Kansas & Texas Railroad, and Greenville was on the line of the latter road. The only bill of lading which was delivered to the shipper is the one to which reference has been made. Just what occurred at Dublin does not appear, except what may be inferred from additions to the bill of lading after the car left Stamford; i. e., the eggs that were put into it at Waco, what were in it when it left Greenville, and what were found in it when it reached New York. After the car left Stamford, there was added to the bill of lading, after the words "Put in 2000 lbs. Ice at Dublin":

"131 cs. eggs loaded     Dublin
"176 cs. eggs loaded     Waco
"436 (four hundred thirty-six cases)
"Rec'd four tons ice Denison, two tons ice Parsons, to capacity at East St. Louis and keep
fully protected with crushed ice and 10% salt."

At Waco 176 cases of eggs were put into the car, but no new bill of lading was issued. The witness Seifer, who was the agent of the Missouri, Kansas & Texas Road at Waco, testified:

"* * * Shipment was shown to be moving on original bill of lading issued by the Texas Central Railroad Company, but notation was made on the original waybill accompanying the shipment that 176 cases of eggs had been loaded by the M., K. & T. at Waco."

At Greenville, the final point designated in the bill of lading at which loading was to be finished, no additional cases were put into the car, but a final inspection of it was made by a representative of the consignors, and the car then moved forward under the bill of lading issued by the agent of the defendant at Stamford.

The car arrived in New York on the 22d of July, over the Delaware, Lackawanna & Western Railroad, and notice of that fact was given to the consignors, who surrendered the bill of lading properly indorsed to the agent of the Delaware, Lackawanna & Western Railroad at the Cortlandt street pier, in the city of New York, and 50 cases of the eggs were then taken from the car; a receipt being given for the same as in good condition. These cases were then taken to the warehouse of A. B. Patterson & Co., and found to be in a damaged condition. A. B. Patterson & Co., through their representative, immediately informed the agent of the Delaware, Lackawanna & Western Railroad of the condition of the eggs as shown by inspection, and asked permission to amend the receipt to conform to the facts, which was refused, on the ground that such receipt would then be contrary to the rules of the Trunk Line Association. A. B. Patterson & Co. thereupon refused to take the balance of the eggs unless they were allowed to receipt for them in condition which an examination would disclose. An examination was denied. A. B. Patterson & Co. refused to take the balance of the eggs, consisting of 374 cases, and they were subsequently sold by the Delaware, Lackawanna & Western Railroad. This action was brought to recover the value of the 374 cases.

The plaintiff had a verdict for $2,344.98, and from the judgment entered thereon and from an order denying a motion for a new trial the defendant appeals.

I am of the opinion that the plaintiff was entitled to recover under the so-called Carmack Amendment (34 U. S. Statutes at Large, 584, 595), which provides:

"* * * That any common carrier * * * receiving property * * * shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass. * * *"

The defendant by its contract agreed to deliver in a car specified a car load of eggs to the shipper in the city of New York. It fixed the freight rate on the entire shipment from Stamford, Tex., the place where the car started, to New York, irrespective of the place where the car might be loaded. The bill of lading issued by defendant's agent at Stamford stated: "The rate of freight from Stamford to New York 120 is in cents per 100 lbs." When this bill of lading was isued, as appears from it, defendant contracted to stop the car at Dublin, Waco, and Greenville "to finish loading." There is no dispute between the parties as to the number of cases of eggs which were in the car when it left Greenville and when it reached New York. Pursuant to defendant's agreement that it would stop the car after it left Stamford at the points named to finish loading, 131 cases were put on

at Dublin, and 176 cases were put on at Waco, which, with the 129 cases put on at Stamford, made 436 cases. But it seems 12 cases were taken out at Greenville. Plaintiff's witness Strom testified that there were 424 cases in the car when it left Greenville.

It is urged by the appellant's counsel that the recovery here cannot be sustained under the Carmack Amendment in any event for more than the value of the eggs loaded along defendant's line, because the balance of the eggs were received not by it but by the Missouri, Kansas & Texas Road. It seems to me this contention is unsound because defendant's contract was to deliver the car load of eggs to be loaded at various points in New York City. The Missouri, Kansas & Texas Road issued no bill of lading for the eggs which it put into the car. It simply entered upon the original bill of lading the loading of so many cases. Whatever eggs the Missouri, Kansas & Texas Road put into the car it loaded them as the agent of the defendant, which under the Carmack Amendment made it liable as though it had itself received and loaded them. Smeltzer v. St. Louis & San Francisco Railroad Company (C. C.) 158 Fed. 649, sustains this view. There the bill of lading recited that the defendant received from the shipper certain packages in good order—

"consigned and marked to T. Cochran & Co., New York, N. Y., to be transported over the line of the St. Louis & San Francisco Railroad Company to St. Louis station, and delivered in like good order to the care of the Big 4 and Empire Line, which line is a part of the route to the place of destination of said freight, it being distinctly understood 'that the responsibility of each carrier shall not begin until it receives the freight from the consignor or from some connecting carrier and shall cease when it delivers the same to a common carrier or to the consignee. * * * No carrier shall be responsible for loss or damage of any of the freight shipped, unless it is proved to have occurred during the time of its transit over the particular carrier's line.' "

The real question there presented was whether the bill of lading obligated the initial carrier to deliver the shipment to the consignee in New York, or whether it was discharged from all responsibility when it delivered the freight to the Big 4 at St. Louis station. It was held that the defendant was liable, and that, notwithstanding the bill of lading, the Big 4 was the agent of the defendant to complete the delivery. Judge Rogers, who delivered the opinion, said:

"I conclude that prima facie the Big 4 and Empire Lines were, under this contract as it now appears of record, the agents of the defendant, and that it could not contract against its liability for the negligence of its own agents, and that the seventh section of the Act of June 29, 1906, strikes down the provision in the bill of lading exempting the defendant from liability for loss occurring on the lines of its agents or connecting carriers."

This case was cited with approval by the United States Supreme Court in Atlantic Coast Line v. Riverside Mills, 219 U. S. 186, 207, 31 Sup. Ct. 164, 55 L. Ed. 167, 31 L. R. A. (N. S.) 7.

The purpose of the Carmack Amendment was to enable the shipper in case of loss or damage to his goods to have recourse to the initial carrier, and leave the initial carrier to its recourse for whatever damage it might have to pay to the company doing the injuries in case

such injuries were done by a connecting line. The wisdom of the act is well illustrated in the present case.

[2] It is also urged that no liability on the part of defendant survived the arrival of the car at Greenville; in other words, that the eggs were there delivered to the shipper. As we have already seen, the defendant agreed that the car should "stop at * * * Greenville to finish loading." The car did stop there, and was inspected by the shipper's agent. Cases were examined and those in poor condition removed. They were then recounted, the car was sealed, and moved forward under the original bill of lading. In stopping the car at Greenville defendant simply carried out its contract. Neither of the parties contemplated that the shipment was to be there delivered, and there is nothing in the bill of lading from which any fair inference can be drawn that the stopping of the car at that place was to constitute a delivery, or that defendant should thereafter be relieved of liability.

Other questions are raised as to the admission of evidence and especially as to the value of the eggs, but, after a careful consideration of the record, I have not found any errors upon either of those subjects which would justify a reversal of the judgment. I am of the opinion that the judgment is right, and should be affirmed.

CLARKE, SCOTT, and DOWLING, JJ., concur.

INGRAHAM, P. J. I dissent from the affirmance of this judgment. It is claimed that the defendant is liable for the shipment under the provisions of Interstate Commerce Act Feb. 4, 1887, c. 104, 24 Stat. at Large, 379 (U. S. Comp. St. Supp. 1911 p. 1284), as modified by the so-called Carmack Amendment of June 29, 1906 (chapter 3591, 34 Stat. at Large, 584, 595 [U. S. Comp. St. Supp. 1911, p. 1288]). Undoubtedly at common law except for this statute the defendant would not be liable as the evidence satisfactorily established the fact that the goods were delivered in good order to the Missouri, Kansas & Texas Railroad, the railroad designated in the bill of lading as the connecting road to continue the shipment specified in the bill of lading. By that statute, as there amended, it is provided that:

"Any common carrier, railroad, or transportation company receiving property for transportation from a point in one state to a point in another state shall issue a receipt or bill of lading therefor and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier, railroad, or transportation company to which such property may be delivered or over whose line or lines such property may pass."

It seems to me that the liability on the defendant imposed by this provision was limited to the property received by the defendant before the car in which it was being transported was delivered to the connecting carrier.

The evidence offered by the plaintiff shows that the defendant delivered to the shipper at Stamford, Tex., on July 6, 1909, a bill of lading which admits the receipt of 129 cases car eggs in patent carriers loaded at Stamford. It was further provided that this car was to

stop at "Greenville, Dublin, Waco, to finish loading," and that the route was to be the Texas Central (the defendant) and the Missouri, Kansas & Texas at Waco. The evidence is undisputed that Waco was the eastern terminus of the defendant road; that the defendant connected at Waco with the Missouri, Kansas & Texas Railroad running to New York, and also with other roads through which shipments could be made to New York; that Greenville was not on the defendant's road, but Stamford and Dublin were stations on the defendant's road; that the 129 cases of these eggs were delivered to the defendant railroad at Stamford, and at that time the defendant issued the bill of lading to which attention has been called. This bill of lading was prepared by the agent of the shipper and presented to the defendant's agent and signed by him when these eggs were delivered. The car was then sealed and forwarded at 10:50 a. m. on July 9, 1909. The bill of lading issued when this first shipment was made was admitted in evidence, and is the one before referred to. The next evidence we have of this car is when it arrived at Waco, Tex., about July 8, 1909, and was delivered to the Missouri, Kansas & Texas Railroad, the connecting line indicated on the bill of lading. One hundred and seventy-six cases of eggs were loaded in the said car while it was on the tracks of the Missouri, Kansas & Texas at Waco, and this loading was done by the shippers themselves. No bill of lading seems to have been given by the Missouri, Kansas & Texas or any other railroad for this shipment at Waco. The witness stated that no new bill of lading was given because the shipment was shown to have been moving on the original bill of lading issued by the Texas Central Railroad company, the defendant, but notation was made on the original waybill accompanying the shipment that 176 cases of eggs had been loaded by the Missouri, Kansas & Texas at Waco. The car then continued to Greenville on the Missouri, Kansas & Texas Railroad, when the eggs were examined, and the shipping clerk for the shipper testified that "424 cases of eggs were loaded in this car on the 12th day of July, 1909, and the quality and condition of the eggs when loaded were good." This car load of eggs was delivered to the Missouri, Kansas & Texas, consigned to the plaintiff at New York, and the car was placed upon the private track next to the warehouse of the shippers. The eggs were trucked to the car in cases, and placed in position, and, when the car was loaded, the witness counted the eggs as the egg cases were restacked, and all cases in bad order were taken out, and the car then delivered to the Missouri, Kansas & Texas Railroad for shipment to New York, and left for New York on July 13, 1909. No additional cases were placed in the said car at Greenville, Tex. There was produced by the plaintiff a paper that had come from the general offices of the shippers at Greenville, Tex., which was marked for identification. Subsequently, when the plaintiff received notice that the eggs had arrived in New York, this paper that had been marked for identification was presented to the Delaware, Lackawanna & Western Railroad Company, which road had transported the eggs to New York, and on that paper 50 cases of the eggs were delivered to the plaintiff. The plaintiff then offered this paper in evidence, which was objected to by

the defendant as irrelevant, immaterial, and incompetent. That objection was overruled, and the defendant excepted. I do not think this paper was competent. It was in form like the copy of the bill of lading that had been issued at Stamford by the defendant with the addition of a statement that 131 cases of eggs had been loaded at Dublin and 176 cases of eggs had been loaded at Waco, but it was not proved by whom that addition was made, and was, in fact, not proved that this bill of lading had ever been issued by the defendant. It was a paper that had been received from the shipper and presented to the carrier at New York. But, whether it was admissible or not, it had no probative force as to the shipment of eggs either at Dublin or Waco. The only evidence, therefore, as to the shipment of these eggs while the car in which they were transported was upon the defendant's road, was the original shipment of 129 cases of eggs loaded at Stamford. We have evidence that 176 cases were loaded in this car at Waco after the car had left the defendant's road and passed in the control of the agents of the Missouri, Kansas & Texas, but there is no evidence as to where the remaining cases were shipped or by whom they were received, and the question is which of these eggs, if any, were received by the defendant for transportation from a point in Texas to New York. Assuming that the defendant furnished a case for the shipment of the eggs at Stamford to New York and received at Stamford a portion of the load of that car, I think the eggs delivered to the defendant at that point and placed in the car were received by the defendant for transportation to New York, and that, under the amendment of February 4, 1887, to the Federal Interstate Commerce Act, the defendant was liable if the eggs were not delivered in New York as required by the bill of lading. The mere transshipment at Greenville for the purpose of proper packing and counting of the eggs in the car at that point was not a termination of the contract of transportation made by the defendant which would relieve it from liability; but, to hold the defendant liable under this act, the evidence must disclose that the eggs which were not delivered were received by the defendant, and eggs not delivered to the defendant for transportation or actually received by it for that purpose do not, as I read this act, come within its provisions.

I think, therefore, that the defendant was liable only for the eggs received by it, and the only evidence of any receipt by the defendant of eggs for transportation was the 129 cases of eggs loaded at Stamford. There was nothing in the transaction which indicates that the defendant constituted the Missouri, Kansas & Texas Railroad or any other road its agent to receive goods for transportation. It shipped a car with eggs on it that it had received, with directions that the car should stop at a station on a connecting road to receive additional eggs to be transported to New York, but the eggs when received by the connecting road or while the car was on its road and under the control of its agents was received by the connecting road, and not by the defendant.

I think, therefore, that this judgment should be reversed and a new trial ordered, with costs to the appellant to abide the event.