## STINSON v. YAZOO & M. V. R. CO.
### No. 4920.

Court of Appeal of Louisiana.
Second Circuit.
March 8, 1935.

Thompson & Thompson, of Monroe, for appellant.

Oliver & Digby, of Monroe, for appellee.

DREW, Judge.

Defendant in its brief correctly states the issues in this case. They are as follows:

Plaintiff sued to recover of the defendant railroad company $568.63 for loss and damage growing out of a shipment of horses originating at Deming, N. M., on the Atchison, Topeka & Santa Fe Railway Company and destined to Monroe, La., which loss and damages, plaintiff alleged, was caused by the negligent handling of said shipment of live stock by the common carrier railroad company over whose lines it moved. In his petition, plaintiff alleged that the car in which the live stock moved originally contained thirty-nine head of horses; that in transit eight horses, valued at $32.50 each, were killed; that one stallion, valued at $150, died after being unloaded at Monroe, from injuries sustained in transit; and that eight other horses were bruised, snagged, and skinned, some to the extent of 20 per cent. of their alleged value, and others to the extent of 50 per cent. of their alleged value; and, in addition to said claim, plaintiff asked to be reimbursed the amount expended for medicine for treatment of the injured horses, for freight on the dead horses, and for burial of the dead horse at Monroe.

Answering plaintiff's complaint, the defendant railroad company averred that a shipment, consisting of thirty-one head of range horses and eight colts, moved in car A. T. & S. F. No. 50839, transferred at El Paso, Tex.,

into car T. & P. No. 22041, over the lines of the A. T. & S. F. Railway Company, initial carrier, T. & P. Railway Company, intermediate connecting carrier, and Y. & M. V. Railroad Company, delivering or terminal carrier, from Deming, N. M., to Monroe, La., under a uniform live stock contract issued by the initial carrier.

Defendant also alleged that the carriers handled said shipment in a careful and prudent manner and that the injuries sustained by said animals were not due to any rough or undue handling by said carriers, or either of them, but, on the contrary, the loss, damage, and injuries complained of by plaintiff were occasioned solely by the inherent vice, weakness, or natural propensity of said animals and/or by crowding upon one another and kicking or goring themselves or each other, for which said loss, damage, or injuries defendant is relieved under the terms and provisions of the uniform live stock contract under which said shipment moved.

Judgment was rendered in favor of plaintiff for the amount sued for, less the item of freight on the horses which died, from which judgment defendant has appealed. Plaintiff has answered the appeal.

In this court defendant urges that the shipment in question moved in interstate commerce and that the rights and liabilities of the parties to this shipment depend upon federal legislation, the bill of lading, and the common-law rules as accepted and applied in federal tribunals; and therefore, under the Carmack Amendment to the Interstate Commerce Act, liability for loss or damage to an interstate shipment is imposed upon the initial carrier and the initial carrier is by statute made liable for the loss or damage occasioned by connecting and/or delivering carriers; that connecting and/or delivering carriers are not primarily liable, unless the loss or damage occurred on their lines; that since the defendant herein was the delivering carrier, and the evidence shows conclusively that no damage was caused by the delivering carrier, it is not liable in this suit. Many decisions are cited to support this contention. At the time the cited decisions were rendered, they correctly interpreted the law. However, the Interstate Commerce Act, § 20, par. 11, was amended by Act of March 4, 1927, § 3, 44 Stat. 1448, and again by Act of April 23, 1930, 46 Stat. 251 (49 USCA § 20, par. 11), and, as amended, section 20, par. 11, of the Interstate Commerce Act makes the delivering carrier liable for the loss, damage, or injuries to property caused by it, the initial carrier, or any connecting carrier. It therefore follows that if any loss, damage, or injury were caused to plaintiff's property from the time same was received by the initial carrier until it was delivered by the delivering carrier, the defendant herein (the delivering carrier) is liable therefor.

The car of live stock, consisting of thirty-nine head of horses, mares, and three young stallions, was originally loaded by the A. T. & S. F. Railway Company at Deming, N. M., on July 27, 1933. It is clear from the record that all the damage was done to the stock before they left Deming, and was caused by the unnecessarily rough handling of the car in which the stock had been loaded. The train had been made up and it consisted of many heavily loaded cars. A short time before leaving, the engine pulled from or near the stockyards the one car containing the thirty-nine animals and backed it into the train of cars in order to couple it on to them. It did so with such force as to cause every one of the animals, except a three year old stallion which was tied in one end of the car, to keep him separated from the other animals, to be thrown from their feet and piled upon each other in one end of the car. The car was immediately cut loose and returned to the stockyards where the animals were unloaded. One or more were dead at that time and the remainder, for which damages are claimed, were injured. They were kept in the stockyards for forty-eight hours, then reloaded and pulled out on their journey. They were unloaded two or more times for rest and treatment after leaving Deming, and in each instance were kept in stockyards for twenty-four hours or more. The handling of the car after it left Deming, N. M., until its delivery in Monroe, La., was with due care and the animals were given all the attention possible under the circumstances. Due to the injuries received, as above related, at Deming and en route, eight head of the horses died and, soon after unloading at Monroe, another one died.

Before unloading the animals at Monroe, defendant called its veterinarian who inspected the animals and decided that they were the worst injured car of live stock he had ever seen, and he and plaintiff at that time agreed as to the amount of damage done each head, which is shown to have been a very low estimate, due to the condition of the stock. Plaintiff claimed exactly what he paid for the eight head that died, and the amount he and defendant's veterinarian agreed upon for injuries. He amply proved both amounts, as well as the other small items consisting of burying one horse, medicine used in transit

 424

to treat the horses, feed which had to be bought during the unnecessary delays en route, etc. He also claimed the freight charged on the eight head which died in transit. This last amount was denied him by the lower court and is not claimed here by plaintiff. It is therefore unnecessary to discuss this item.

Defendant's principal defense urged is that the injuries were caused solely by the inherent vice, weakness, or natural propensities of said animals; by crowding one upon the other or kicking or goring each other, and that under its contract with the shipper, it is not liable under the provisions of the uniform live stock contract under which said shipment moved.

The lower court found the facts did not sustain its defense, and we think the evidence justifies its finding. There is some evidence in the record by different members of the train crew to the effect that at different points in transit the animals were squealing, biting, and kicking. There is some evidence that the car of animals consisted of wild broncs just from the plains and wholly unbroken. However, the preponderance of the testimony shows the animals to have been standard bred, sired by stallions purchased by the government, and loaned to stock raisers in order that standard bred horses might replace the broncs. The United States government bought 8,000 such stallions and loaned them out for no other purpose than to raise stock. There is some further testimony in the record which, taken all in all, was to the effect that it was possibly the best carload of horses to arrive in Monroe, La., for years.

The testimony further shows that the injuries found on the animals could not have been caused by biting, kicking, etc., and could only have been caused by very rough handling of the train at some point in transit. The three stallions in the car were young, two of them two years old and not shown to have been vicious or to have done any damage to the other animals. The other one, which was three years old, was tied in one end of the car and could not harm the other animals, in fact, he was so badly injured before leaving Deming, he was not able to harm them if he had been loose. He died a few hours after reaching his destination. Defendant claims it is not liable for these stallions for the reason that after the animals had been unloaded at El Paso, Tex., and were about to be reloaded, the agent of the Texas & Pacific Railway Company there protested the shipping of this animal, due to its badly wounded condition, and that it was shipped only after the caretaker in charge assumed the risk of the shipment. The animal was rested at El Paso, treated, and reloaded into the car. He received no further injuries and was loaded after and treated by the caretaker en route. It is not shown nor intimated that he could have been cured had he been left at El Paso, nor is it shown that the trip from there to Monroe in any way changed his condition. He was never down in the car after leaving El Paso and is not shown to have been injured in any other way.

There is no other defense urged by the defendant which the pleadings or evidence will justify. We therefore conclude that the judgment of the lower court is correct and it is affirmed, with costs.