*118
 
 FOURNET, Justice.
 

 The plaintiff, T. O. Bancroft, doing business under the firm name of Bancroft Bag Company, consignee of an interstate shipment of a carload of paper, instituted this suit against the Yazoo & Mississippi Valley Railroad Company, the delivering carrier, .to recover the value of the shipment alleged to have been damaged in transit, together with the cost incurred in making tests of the paper at the request of the defendant and $8 per month for the storage of the paper from the date of delivery thereof to plaintiff to the date of its removal from his premises.
 

 The defense, in substance, is that the shipment was carefully handled from the point of origin to the point of destination, and that if any of the rolls of the paper were damaged by water or otherwise, such damage was not occasioned by the fault of the defendant carrier.
 

 The trial judge rendered judgment in favor of the plaintiff as prayed for, with the exception of his claim for storage, which was denied. The defendant appealed suspensively from the judgment and the plaintiff answered the appeal, praying that the judgment of the lower court be amended by allowing his claim for storage.
 

 The plaintiff, on August 4, 1938, ordered from the Taggart Corporation 120,000 pounds of natural crimped carbon kraft paper, to be shipped by freight and delivered to him at his factory in West Monroe, Louisiana. On August 19, 1938, the Taggart Corporation, in compliance with the order, shipped from its factory to plaintiff 64 rolls of the paper, which were delivered by the defendant on September 3, 1938 in an apparently damaged condition. The remainder of the order was shipped in two cars on August 23, 1938 and delivered on the 8th of September, following in good condition.
 

 Under the Interstate Commerce Act, Section 20, paragraph 11, as amended, 49 U.S.C.A. § 20 (11), the delivering carrier, under an interstate contract of affreightment or through bill of lading, is liable for goods lost or damaged in transit by it or any of the c'ommon carriers to which such property may be delivered or over whose line such property may pass. 49 U.S.C.A. § 20 (11), as amended July 26, 1926, c. 761, 44 Stat. 835; March 4; 1927, c. 510, Sec. 3, 44 Stat. 1448; April 23, 1930, c. 208, 46 Stat. 251. See, also, 13 Corpus Juris Secundum, Carriers, § 424 b. (2), pp. 929 and 930, and Stinson v. Yazoo & M. V. R. Co., La.App., 159 So. 422. The liability of the carrier in such cases is for full actual loss of the property at the place of destination at the time delivery of the goods should have been made. Anderson, Clayton & Co. v. Yazoo & M. V. R. Co., 174 La. 762, 141 So. 453; 10 C.J. 606, p. 395. It therefore follows that in’ such cases it is only necessary for the consignee to allege and prove (1) that the initial carrier received the shipment in good condition, (2) that the shipment arrived at its destination in a damaged condition, and (3) the amount of the loss.
 

 The uncontradicted testimony • in this case is that the shipment was received from the consignor by the initial carrier at
 
 *120
 
 Carthage, New York, in good condition, from which place it moved to the Milton street pier, Brooklyn, New York, and was there received by the Pan-Atlantic Steamship Corporation. From there it moved by steamship to New Orleans, where exceptions were noted to the shipment showing certain damages to a number of rolls of the paper. At New Orleans the shipment was loaded and moved to West Monroe, Louisiana, on the line of the defendant, the shipment arriving at plaintiff’s factory on September 3, 1938. Before unloading the car, plaintiff’s superintendent noticed the paper was damaged in that the rolls were telescoped, cut on the edges, and had wooden splinters in them, and plaintiff promptly notified the defendant’s agent of the condition of the shipment. Plaintiff was requested by defendant’s representative to unload the car in order that the amount of the damage might be ascertained, and, on September 15 following, plaintiff filed a claim with the defendant for damages to the shipment in the 'sum of $968.25, or 50 per cent of the invoice price and the freight charges on the shipment. On December 1, 1938, plaintiff addressed a letter to defendant advising it that while his previous claim had been for visible and apparent damages, he had since discovered, in an attempt to convert 3 rolls of the paper, the same to be too wet for conversion into bags; claiming the shipment a total loss; and demanding reimbursement in full. Subsequently, on the 9th and 10th of December, 1938, at the request of the defendant, plaintiff made tests of 10 rolls, the result of which was that 3 of the rolls were converted at a loss, with much inconvenience and difficulty, and thát the remaining
 
 7
 
 rolls could not be converted at all.
 

 It is defendant’s contention that the-plaintiff has failed to prove his case by a preponderance of the evidence. In support of this contention its counsel argued that the record shows the visible or apparent damage to the paper, i. e., that it was torn and soiled on the outside, cut on the edges, and telescoped, was caused by the usual and normal handling in transit, is inconsequential, and therefore not compensable in damages; that the claim for the other element of damage, dampness, was not proved, in that the testimony shows that the paper, at the time of delivery, contained no water stains; and that while at the time of shipment it had a moisture content ranging between
 
 7
 
 and 8 per cent, according to the tests made by the chief chemist of the Brown Paper Mill Company, it was shown that there was practically no change in the moisture content of the paper, these tests disclosing a percentage of moisture ranging between 7.33 and 8.43 per cent. Furthermore, counsel argued that only 13 of the 64 rolls were tested and that there is no proof in the record with respect to the condition of the remaining 51 rolls.
 

 The record reveals that plaintiff and his plant superintendent, Mr. Craighead, and also Mr. Lafayette, machine attendant, testified that the shipment of paper in controversy, because of the excessive water content thereof, could not be profitably converted into bags. It was also shown by their testimony that a test of 10 rolls selected at random from the 64 rolls was made.
 
 *122
 
 Three were converted with much difficulty and with great loss of time. The remaining rolls, after reaching a certain depth, approximately eight inches into the interior of the roll, had to be withdrawn from the machine because of excessive moisture, the density of the moisture increasing toward the center of the roll. The plaintiff stated further that the experiments and tests made showed that 50 per cent of the paper ■in pounds was lost, and, in addition thereto, that two or three times the normal amount of time required was consumed in converting the remaining 50 per cent into bags, thereby increasing his cost of operation to the extent that it made his loss equal to the value of the 50 per cent of the bags converted. In this he was corroborated by the testimony of Mr. Craighead.
 

 A review of the testimony of Mr. Whitfield, chief chemist for the Brown Paper Mill Company, who made several tests of the paper at the request of the defendant, shows that the first test was made of a sample of the paper taken by defendant’s agent from one of the rolls plaintiff had attempted to convert into bags, the test showing a moisture content of 8.34 per cent. He made two more tests of similar samples brought over to him, which showed moisture contents of 7.33 and 7.38 per cent. Then he made two tests of a complete roll of paper brought to him, which tests showed moisture contents of 8.32 and 8.43 per cent, respectively. He further stated that the latter tests were made by cutting into the roll “ * * * approximately * * * 6 inches * •* * anyway * * * it wasn’t less than 4 inches.”
 

 The first three tests, in our opinion, were not fair tests of the moisture content of any of the rolls, as they were made of samples taken from the outer portion of the rolls plaintiff had attempted to convert into bags, and, necessarily, the moisture of the paper samples was to some extent affected by exposure. Nor do we think that the last two tests made of a single roll are fair tests of the entire shipment, particularly when the fact that the samples were taken from the roll at a depth of about four or six inches only is considered together with the fact that the tests made by plaintiff show difficulty was experienced at a depth of between two and three inches and increased, as the density of the moisture of the paper increased, toward the center of the roll, until it became impossible to convert the paper into bags after approximately eight inches into the interior of the roll had been reached, and the rolls had to be taken from the machine. It is our opinion, therefore, that such evidence does not outweigh the positive testimony of the plaintiff and his witnesses that the paper could not be converted into bags because of the excessive dampness. We are fortified in this view by the testimony of defendant’s witness, Mr. Puig, who examined the paper and stated it was very damp and that he had suggested that the plaintiff make the tests of the 10 rolls, which tests, he admitted, were fair tests of the condition of the entire shipment. He also stated that the test for moisture content, made at defendant’s ■ request, showed a salt content of .680 per cent.
 

 
 *124
 
 Plaintiff has expressly abandoned his claim for the storage of the paper. It will therefore be unnecessary to pass on that phase of the case.
 

 For the reasons assigned, the judgment of the lower court is affirmed, at appellant’s cost.
 

 LAND, J., absent.