McBRIDE, Judge.
Anthony Piazza, plaintiff, who operates a restaurant and bar at Gretna, Louisiana, purchased, during 1945, several carloads of beer manufactured by Eulberg Brewing Company at Portage, Wisconsin. Plaintiff deposited $1.00 on each, case of beer purchased, in order to assure the return to the brewery of the empty bottles, - and upon the return of such empty bottles the brewery would refund to plaintiff $1.00 on each case returned. On or about August 11, 1945, plaintiff shipped 2062 cartons of empty beer bottles and 206. cases of spoiled beer, for credit, to Eulberg Brewing Company at Portage, Wisconsin. The Commercial Terminal Warehouse Company, Inc., under a contract with plaintiff, loaded from its warehouse the cartons and cases into a freight car, placed seals on the doors of the car, and then turned the car over to the Louisiana & Arkansas Railway Company, for delivery to the consignee, the railroad company issuing a uniform straight bill of lading covering the car,’ and consigning it as directed. However, the car was diverted in transit upon instructions of the consignee, Eulberg-Brewing Company, to Hartig Brewing Company of Watertown, Wisconsin, the former “owing” the latter a large number of empty bottles, the car being diverted to the Hartig Brewing Company’s plant at Watertown for the purpose of permitting it to remove from the car the empty beer bottles therein.
When the car was opened by the Hartig Brewing Company upon arrival at Water-town, it was found that the contents thereof had been severely damaged. Some of the empty beer bottles were salvaged, and they, with the broken glass from the other empty bottles, were unloaded. All, or some, of the spoiled beer, was allowed to remain in the car, and the car was then consigned by Hartig Brewing Company to Eulbreg Brewing Company, Portage, Wisconsin, under a separate bill of lading issued by the Chicago, Milwaukee, St. Paul and Pacific Railroad Company, and was subsequently delivered to the consignee.
Alleging that when the shipment reached Watertown, Wisconsin, 1062 cartons of empty beer bottles, valued at $1.00 per carton, and all of the 206 cases of spoiled beer, valued at $2.60 per case, had been damaged to the extent of complete destruction, plaintiff filed this suit for $1597.60 against the Louisiana & Arkansas Railway Company and Commercial Terminal Warehouse Company, Inc., in.solido, claiming that the da'mage to the shipment was caused by the negligence of the. railway company in transporting the car to Water-town, and intimating that the improper loading of the car by Commercial Terminal Warehouse Company contributed to the loss.
After the exceptions filed by the Louisiana & Arkansas Railway Company had been overruled, which exceptions, incidentally, were not reurged before us, said defendant answered, setting forth that its employees were free from negligence, and that if there was damage to the shipment, which was denied,’ that the damage was due to the loading of the bottles , in broken, weak, dilapidated cartons which were improperly placed and stacked within the freight car by the shipper’s agent. In the alternative, the railroad company prayed that if it should be cast in damages, then it should have a judgment for a corresponding ‘amount against the Commercial Terminal Warehouse Company, Ihc., which *672 loaded the car. The warehouse company, in its answer, disclaimed any liability whatsoever.
A trial of the case on its merits in the court below culminated in a judgment in favor of plaintiff for $1597.60 against the Louisiana & Arkansas Railway Company; plaintiffs suit against the other defendant, the warehouse company, was dismissed. The railroad alone, has appealed from the judgment, and, therefore, the Commercial Terminal Warehouse Company, Inc., has passed out of the case, insofar as plaintiff’s claim against it is concerned.
The only basis upon which the Louisiana & Arkansas Railway Company, the initial carrier, can he held liable to plaintiff is under the provisions of the Carmack Amendment to the Interstate Commerce Act, 49 U.S.C.A. § 20(11). Plaintiff originally adopted the position that his suit was one sounding in tort, and that his action was ex delicto rather than ex contractu. During the course of the trial below, however, plaintiff committed himself to an action on the contract, and introduced into evidence the bill of lading issued by the defendant railroad.
The bill of lading is marked with the letters “SL&C,” which, as is well known, means “shipper’s load and count.” It is well settled that where the car is furnished to the shipper who' himself loads his goods, he cannot recover for damages until he has alleged and proved that the-goods, when loaded, were not in the same damaged condition later complained of, and that the goods were properly boxed or crated if either appears to be necessary and customary, and were properly loaded and placed into the car. See Fowles v. Louisville & N. R. Co., 15 La.App. 421, 132 So. 240.
We direct our attention' first to the question whether the car was properly loaded by plaintiff’s- agent, the warehouse company. There is an abundance of testimony concerning the manner and method employed. The shipping and receiving clerk of the Commercial Terminal Warehouse Company, Inc., supervised this particular shipment, and the gravamen of his testimony, which .is unrefuted, is that the cartons and cases were stacked in the car in the usual and customary manner. The president of the warehouse company, who has been in the loading business for approximately forty years, testified that he inspected the shipment, and that the car was loaded properly and in the customary manner. He stated that during the year 1945 his concern had loaded 61 cars of empty beer bottles, all in the same manner as in the instant case, and that his company received no complaints of breakage.
The evidence shows that the cartons and cases were secondhand corrugated cardboard boxes of varying sizes, and that some of them were tied with string so that the contents would not fall out, and others were strapped with tape. The spoiled beer was stacked in the beam end of the car, 8 cartons across, which left a 6 inch slack, and the opposite end was loaded with 9 cartons across; the load reached to within a few inches of the roof of the car, and was characterized as “flush.” It was testified to by one of the witnesses for the warehouse company that the slack was left in the beam end, where the spoiled beer was located, because of the possibility of the beer exploding. The load was placed up against one of the doors of the car, and the other door was braced with wooden boards nailed to the posts of the door.
Warren T. Marseilles, who had been employed for 29 years as city auditor by the Western Weighing and Inspection Bureau, a subsidiary of all the railroads, and who testified that he is an expert on the loading of railroad freight cars, his exclusive work consisting of inspecting beer shipments, was present in the court below and heard the testimony of the employees of the warehouse company as to the method of loading the car, and examined the diagram submitted by those employees. Marseilles testified, under examination by counsel for the railroad company, that: “From this (loading diagram) and from what I heard Mr. Gilbert testify, I would say the car was properly loaded. * * * ”
On cross examination, the witness reiterated that from the explanation of Gilbert, he would say that the. car had been properly loaded, and in the manner in *673 which his association advised shippers to load cars.
As to the corrugated cartons and cases, the evidence shows that while they were secondhand, they were serviceable, and that cartons and cases of the same kind had been used in making other shipments, about which there had been no complaints of breakage. Gilbert, of the warehouse company, stated than when Piazza received a carload of beer, it would be allowed to remain in his company’s warehouse, and that Piazza would withdraw, from time to time, such cases as the volume of his business demanded. Gilbert admitted that when cartons of empty bottles were received from Piazza to be stored in the warehouse for return shipment to the brewery, he would sometimes-find defective cartons, but in those instances he would remove filled bottles of Piazza’s beer from serviceable cartons in the warehouse, into which he would transfer the empty bottles from the defective cartons.
In addition to the above testimony concerning the condition of the cases and cartons, and the manner in which they were loaded, the record contains the depositions of the station agent of the Milwaukee Railroad at Watertown, who examined the car at Watertown. The station agent stated, “I think the car was loaded about as good as it ,could be loaded considering the condition of the cases.”
Both the station agent and another employee of the, Milwaukee Railroad testified that they noticed no bracing in the car, and they attributed the damage to shifting. However, all of the witnesses who testified for the warehouse company were emphatic that one door of the car was properly braced, and that the load was placed flush against the other door. But whether there was' any bracing placed on the interior of ¿e car is of no moment, as we find that Marseilles testified that it is not at all unusual when a flush load is being transported, such as a load of cartons, not to have bracing in the car.
After a careful examination of all the testimony concerning the loading of the car and the condition of the goods, we unhesitatingly conclude that the goods, cartons, and cases were not defective, nor was the stacking of the cartons and cases in the car improperly done..
Counsel for the railroad company, in brief and argument, advance the further defense that the inherent nature of the shipment was the proximate cause of the damage, and point to testimony in the record to the effect .that the slack was allowed because of a belief by the warehouse employees that there was a possibility that some of the spoiled beer might explode en route.
In Anderson, Clayton & Co. v. Yazoo & M. V. R. Co., 174 La. 762, 141 So. 453, 455, the Supreme Court stated the common law' rule governing the liability of a common carrier, as follows: “ ‘The liability of the common carrier by law, is, as has been seen, an unusual and extraordinary one, based upon considerations'of public policy which have survived the wonderful change in th,e circumstances under which they first arose. By that law the common carrier is regarded as a practical insurer of the goods against all losses of whatever kind with the exception of (1) those' arising from what is known as the act of God, and (2) those caused by the public enemy; to which in modern times, have been added (3) those arising from the act of the public authority, (4) those arising from the act of the shippers, and (5) those arising from the inherent nature of the goods.’ Hutchinson on Carriers (3rd Ed.) § 265. See, also, Elliot on Railroads, vol. 4, p. 605, § 2201.”
The Court said further: “ * * * As to defendant’s nonliability by virtue of the fifth exception to the general, rule, which comprises losses arising from the inherent nature of the goods, it does not appear, and there is no reason to hold, that the nature of cotton in bales is such as to make it subject to spontaneous combustion. Hence, as the burden of proof was on defendant, defendant having received the cotton, to show that the loss was occasioned by one of the five causes named, and having failed to do so, defendant is liable for the loss. 10 C.J. p. 373, sec. 576.” See also 13 C.J. S., Carriers, §§ 80, 254, pp. 158, 541.
*674 No evidence whatsoever was produced by the railroad company to show that the spoiled beer exploded, or that the presence of the beer in the car proximately caused the damage which the shipment manifested at Watertown, and it is clear, therefore, that the carrier has not successfully shouldered the burden imposed upon it by law in its effort to exculpate itself from liability on the ground that the damage was caused by the inherent nature of the shipment.
Plaintiff’s counsel argues that the entire shipment showed evidence of total destruction upon its arrival at Watertown, and advances the alternative argument that even if some of the goods had not been destroyed prior to reaching this destination, such were destroyed on the journey between Watertown and Portage. Counsel takes the position that the railro.ad company had not .the right, without plaintiff’s consent, to divert the shipment upon the consignee’s instructions from Portage to Watertown, and that plaintiff is entitled to recover for all damage done to the shipment up until the time the car ultimately arrived at Portage, its original destination.
We cannot agree with counsel that Lou^ isiana & Arkansas Railway Company is to be held liable for the damage which the shipment reflected when it reached Portage, our opinion being that the carrier’s liability is to be founded upon whatever damage might have been sustained by the shipment before it reached Watertown.
While there are no Louisiana authorities touching this point, the rule prevailing in other jurisdiction is that the consignee under a straight bill of lading is to be presumed the owner of the shipment, and the shipment is under the control of the consignee, and he may direct its movements and divert it to another destination.
The rule is stated thus:
“ * * * the consignee designated in the bill of lading is presumptively the owner of the goods'shipped; and, in the absence of a bill of lading, or under an open bill of lading, it is presumed that the title vests in the consignee absolutely on delivery of the goods to the carrier, subject only to the carrier’s lien for freight, and the consignor’s right of stoppage in transit. Therefore, in the absence of notice to the carrier of the existence of a different relation, it must treat the consignee as the owner of the goods, with authority to control them in transit. * * * ” 13 C.J.S., Carriers, § 148, p. 291.
“While the owner of the goods is under no circumstances required to receive them before arrival at destination, as stated supra § 160 a, he may accept them at any place before or after arrival at destination, and this acceptance will work a discharge of the carrier from further liability ; but the acceptance of delivery at an intermediate point will not relieve the carrier from liability for damages already incurred, * * 13 C.J.S., Carriers, § 166, p. 324.
The Eulberg Brewing Company, according to the depositions of its president, ordered the car diverted to Watertown for the specific purpose of permitting the Har-tig Brewing Company to remove from the car and retain the empty beer bottles. Consequently, the Hartig Brewing Company can be considered no more or no less than the agent of the consignee, Eulberg Brewing Company, and the delivery by a carrier to the agent of the consignee under a straight bill of lading constitutes a final delivery of the shipment and a completion of the contract of carriage.
“ * * * A carrier may, however, rightfully deliver the goods to a person to whom the consignee has directed delivery to be made. Where a carrier receives goods for delivery under a ‘straight’ or nonnegotiable bill of lading for delivery to a person named, without any reservation of power of disposal by the consignor, a delivery to such person, or to his authorized agent, see infra § 172d, completes the contract and relieves the carrier from any further liability. * * * ” 13 C.J.S., Carriers, § 172, p. 331.
As to the proof required of a plaintiff in an action against the carrier for loss or damage to the shipment, our Supreme Court said, in Bancroft v. Yazoo & M. V. R. Co., 194 La. 115, 193 So. 481, *675 482; “ * * * jt therefore follows that in such cases it is only necessary for the consignee to allege and prove (1) that the initial carrier received the shipment in good condition, (2) that the shipment arrived at its destination in a damaged condition, and (3) the amount of the loss.”
The rule for measuring damages is set forth in Anderson, Clayton & Co. v. Yazoo & M. V. R. Co., supra, as follows: “ ‘The general rule is that, when goods delivered to a carrier for shipment are lost in transit, the carrier will he liable for the market value of the goods at the place of destination at the time when delivery of the goods should have been made, less the freight charges to the point of destination if they have not been paid.’ ” See also Gore Products v. Texas & N. O. R. Co., La.App., 34 So.2d 418.
Where property is injured in transit, the measure of damages is the difference between the market value of the property at the time and place of delivery in an uninjured condition, and its value in the depreciated condition in which it was delivered. . 13 C.J.S., Carriers, § 264, p. 610.
However, the market value of the goods at the place of destination is not the sole criterion for assessing damages against the carrier, for in countless freight movements, goods having no market value are transported, and in such cases the liability of the carrier is to be gauged by the intrinsic or actual value of the goods to the owner.
“Where there is no market value for the property at the point of destination, the intrinsic or actual value is the basis for determining the amount of damages sustained by reason of loss of, or injury to, such property, * * 13 C.J.S., Carriers, § 264, p. 614.
The court below, in awarding damages against defendant railroad, undoubtedly took into consideration the condition of the contents of the car upon its arrival at Portage, on the theory that the shipment (less the 1000 cartons of empty bottles unloaded at Watertown) was.a total loss at the ultimate destination.
Upon arrival at the plant of Hartig Brewing Company at Watertown, its employees could not open the car, and the station agent of the Milwaukee Railroad was called upon to assist the employees of the brewery, and he succeeded in opening the car door. Both he and another agent of the Milwaukee Railroad were present at times during the process of unloading, and both testified in their depositions that the shipment showed evidence of having been severely damaged. The station agent stated that it appeared to him as though the car had “ * * * gotten a pretty good jolt somewhere to bring the load out against the doors * *
But the only evidence in the record which details to' any degree the condition of the car, is to be found in the depositions of Harold F. McEvoy, president of Hartig Brewing Company, who supervised its unloading at Watertown. According to his statements, the contents of the car were damaged extensively, and were more in the nature of broken glass and junk than beer bottles. A concentrated effort was made to separate the broken bottles from those which were intact, and he placed four men on the car for more than two days in the unloading project. He finally concluded that the task was hopeless and would be very unprofitable to continue, as the labor cost necessary would have far exceeded the price of new bottles. Although he did not have his records with him, he stated that approximately 400 cases of empty bottles, and “not more than twenty-five cases” of the spoiled beer, were salvaged. Thereupon, the unloading was terminated, and the car, which still contained “ninety-five per cent” of the spoiled beer was consigned to the Eulberg Brewing Company at Portage.
According to the depositions of Alvin Bardin, president of the Eulberg Brewing Company, which were taken at the -behest of counsel for the defendant railroad, when the car reached Portage none of the beer could be salvaged, and the debris in the car was shoveled out and dumped. Bardin stated, however, that 1000-cases of empty bottles had been salvaged at Watertown, *676 and that a settlement was made between his brewery and Piazza, whereby Piazza was paid $1000.00 for whatever empty bottles had been extracted from the car by the Hartig Brewing Company.
Counsel for the railroad filed in the lower court a plea of estoppel, contending that in view -of the written compromise entered into between plaintiff and Eulberg Brewing Company, plaintiff is debarred from asserting his claim against the railroad company for any damage to the shipment.
We see no merit in the plea of estoppel. The import of the document executed by the parties is that it was the contention of Eulberg Brewing Company that out of the shipment in question, all but 1000 cartons of the empty beer bottles had been destroyed in transit, and the sum of $1000.00 was paid to plaintiff by the brewing company,' representing $1.00 per carton, in settlement of whatever claim plaintiff might have against- the-Eulberg Brewing Company for' those empty bottles which were salvaged at Watertown. We fail -to understand how this settlement could even remotely adversely affect plaintiff’s right to assert his claim against the Louisiana & Arkansas Railway Company for the actual damage sustained by the shipment. -
In view of the conflicting evidence of the officials of the two breweries, the record does not establish with exactitude the condition of the shipment at Watertown, but there is no doubt whatever in our minds that severe damage had been suffered by the shipment en route to Hartig Brewing Company. McEvoy’s testimony is that approximately 400 cases of empty bottles; and not more than 25 cases of the spoiled beer, were’ salvaged, while on the other hand Bardin, a witness' for the railroad, stated that the shipment was a. total loss, excepting the salvaged 1000 cartons of empty bottles. ■
The employees of the Milwaukee Railroad, although present during the unloading, and who inspected the. contents of the car at Watertown, made no attempt to inventory or record the amount of the damage, and we have as a guide for the establishment of plaintiff’s damage only the testimony of the two brewery officials.
McEvoy supervised the unloading at Watertown, and witnessed the removal of the contents of the car. If his testimony is to be accepted to fix the carrier’s liability, 1662 cartons o'f empty bottles were destroyed. If the testimony of Bardin is to be accepted, then there was a loss of 1062 cartons of the empty bottles, which is the number plaintiff alleges were destroyed.
It is interesting to note at this point that although counsel for the Louisiana & Arkansas Railway Company applied for the commission to take Bardin’s depositions, as a defense witness, along with the depositions of the two railroad employees at Watertown, counsel did not see fit to introduce Bardin’s testimony into the evidence. Bardin’s depositions found their way into the record upon offer by plaintiff’s counsel.
Considering all circumstances prevailing in the case, we believe that we are warranted in concluding that when the freight car arrived at Watertown, all of the empty bottles had been totally destroyed in transit, except the 1000 cases which Bardin, who testified on behalf of the railroad, stated were salvaged by the Hartig Brewing Company, and for which Piazza was paid by the Eulberg Brewing Company.
We do not believe, however, that plaintiff should be allowed a recovery for any of the cases of spoiled beer, as there is no evidence showing how many cases of beer were damaged, or to what extent, in transit to Watertown. The only testimony in that regard emanated from McEvoy, and his evidence is highly confusing. He made the statement that not more than 25 cases were salvaged, and that about “ninety-five per cent” of the beer was permitted to remain in the car, which were consigned by him to Portage under a new bill of lading showing that 206 cases were shipped. He stated that the cardboard cases were wet and soggy, but he did not testify as to the amount of breakage. Perhaps some of the bottles containing spoiled beer were broken, but an indulgence in *677 imagination and conjecture would be necessary in assessing liability against the carrier, and any figure arrived at would be a purely arbitrary one.
We do not know on what theory the railroad seeks judgment against the Commercial Terminal Warehouse Company, Inc., but at any rate the railroad’s prayer for such judgment is denied.
For the reasons assigned, the judgment appealed from is reduced by the sum of $535.60, the amount claimed for the spoiled beer, and as thus amended, and in all other respects, the judgment appealed from ' is affirmed. Plaintiff-appellee is to pay the costs of this appeal.
Amended and affirmed.