AYRES, Judge.
Defendant contracted with plaintiff to transport for a price of $253.76 a truck load of peaches from Hilly and Spearsville, Louisiana, to St. Louis, Missouri, which produce it allegedly had sold through its broker to Sherman Produce Company. The price for the transportation not. having been paid, plaintiff instituted this action therefor, plus $50 additional for loss of the use of his truck and loss of service of his driver for two days caused by the unnecessary delay in unloading the shipment at its destination.
, In reconvention, defendant prayed for judgment against plaintiff in the sum of $1019.23 as an amount allegedly lost by it on the aforesaid shipment by spoilage of the produce allegedly due to the negligence of plaintiff and its driver in not reaching the St, Louis market before closing time on Saturday morning, thus requiring the shipment to be held over until the market opened on the following Monday morning, and in not keeping the produce properly iced or refrigerated in the meantime.
After trial, judgment was rendered rejecting plaintiff’s demands and in favor of defendant on its reconventional demand in the sum of $969.23, representing what the court accepted as the value of the peaches, less freight and other charges. From the judgment thus rendered and signed, plaintiff appealed.
The facts are very much in dispute and whatever confusion has arisen is due not only to" the lack of understanding among all parties concerned, including-the produce company, but to the contradictory character of the'"evidence introduced as well as to the want of evidence which might have been introduced. However, from’ a consideration óf the entire record, after carefully weighing each and every portion thereof, it appears "that the&e pertinent and material ■facts were "'fairly established:
Through a telephone conversation or conversations 'on the afternoon of July. 23, ■1953, between J. B. .Colvin, President of the Louisiana Fruit Growers Association, and B. W./Robertson, a verbal agreement was entered into whereby plaintiff agreed to furnish a refrigerated truck and trailer and driver to transport the load of peaches to St. Louis and deliver it to Sherman Prod.uce Company. As to the time of delivery, the testimony is most contradictory and inconclusive. Defendant contends that the delivery was to be made by or before 6:00 o’clock A.M. Saturday, July 25, 1953. Plaintiff, his wife and his 20 year old son, the driver of the truck, are as positive no m'ention or agreement was made as to the *192 time -the shipment was to reach St. Louis other than on Saturday morning. The wholesale produce market in St. Louis is shown to have opened at midnight and remained open until 6:00 o’clock A.M. for 6 nights a week.
Plaintiff is an employee of the paper mill at Bastrop, Louisiana, where he, his wife and son own and operate a produce market of their own. They are not common carriers but principally transport their own produce from such points as New Orleans to their place of business, but on occasions solicited shipments to those points from which they received their produce.
During 1953, Charles Abbate Company of Hammond, Louisiana, was the exclusive broker for the Louisiana Fruit Growers Association and negotiated what defendant understood to be a sale óf 538 boxes or crates óf peaches to Sherman Produce Company, information of which was communicated to, defendant, whose president thereupon telephoned Robertson for. a truck to make the; delivery in St. Louis,, This truck Robertson reluctantly agreed to furnish. The, truck, -with bunkers of a ton ice capacity, was iced at Ruston, Louisiana, with 1,800 pounds at about 9:00 o’clock P.M. and arrived at Hilly about - 10:00 P.M., July 23, where 96 crates of pre-cooled peaches were loaded. The truck then proceeded some 30 or 40 miles to Spearsville, Louisiana, arriving there about, midnight, for the purpose of completing the load. 442 crates of tree-ripened peaches, not pre-cooled, were loaded from the sheds there. This ■ operation was completed by • 4:00 o’clock A.M., July 24, 1953, and the truck proceeded on its route. A check of the ice in the-bunkers wa's made at El Dorado and then again at Pine Bluff, Arkansas, where 1,500 pounds of ice were added about 2:00 o’clock P.M. A check was again made at West Memphis and later at Osceola, Arkansas, where 600 pounds of additional ice were added about 9:00 o’clock P.M. ' -
Upon arriving at the market of the Sherman Produce Company in St. Louis at 8:45 o’clock A.M. July 25, 1953, where Sherman accepted the delivery tickets as furnished him by the defendant, showing the weights and other data concerning the peaches, Sherman told young Robertson to re-ice the truck, which he did with 1,000 pounds of ice, and then to park the truck on a lot adjacent to his place of business as it would be early Monday morning before the shipment could be unloaded due to the fact that he was 12 hours late and should have been at the market when it opened at midnight. Upon being informed also that the truck could not be unloaded because the workers were getting off from work, young Robertson proposed that he -hire laborers from the street to unload the truck, which, however, 'was refused, Sherman claiming that he had no refrigerated space in which to put the peaches.
‘ Sherman testified that he instructed the driver to keep the truck re-iced. This the driver denies, saying that Sherman only instructed him 'to have it re-iced and then to park -it on-:the- lot. • Nevertheless, young Robertson remained around the* truck all day and at 8:00 o’clock P.M. on that Saturday night again re-iced the truck by adding 600 pounds. Not having slept for - two nights- and a’day, he' then retired to a hotel room, and did not return to the truck -until about 12:30 P.M. the following day, when he found that the truck had been re-iced and the ventilating fan running as he had left it.
Sherman testified that upon arriving at the place of business on Sunday morning, he found the bunkers empty of ice and that he placed 2,000 pounds therein. Shortly after midnight the truck doors were opened, whereupon the peaches were found to have deteriorated. Sherman then phoned the broker and informed him of the condition of the produce and obtained authority to sell the peaches and salvage whatever possible. Sherman Produce Company then unloaded the truck.
The case presents primarily the following questions:
(1) Did Robertson guarantee to deliver the peaches to Sherman- Produce Company *193 prior to 6:00 o’clock A.M. on Saturday, July 25?
(2). Was there any negligence of the carrier prior to the time the shipment arrived in St. Louis? ■
(3) When was actual delivery made to Sherman Produce Company?
(4) What was the responsibility of plain tiff after delivery had been made or tendered in St. Louis?
We shall discuss these questions in the order given:
Colvin’s testimony indicates' there was nc firm understanding that the carrier would be responsible if the peaches were not delivered by 6:00 A.M. He testified that he informed Robertson in their telephone con-’ versations that the peach market closed in St. Louis at 6:00 A.M. on Saturday and that the shipment should arrive there by that time. The record is not clear as tó whether Cólvin conversed by telephone with Robert-1 son only or with Robertson and his wife. However, both deny that Colvin made such a statement. They insist that they did not guarantee the arrival of the shipment at that particular time or at any particular time other than that delivery would be made on Saturday morning. Colvin’s conversation with young Robertson, the truck driver, which was denied by Robertson, to the effect that he told the driver in the presence of Chester Barron that the truck must arrive at St. Louis by that hour is of no consequence because the contract was between young Robertson’s father and Colvin. A careful review and consideration of all the testimony on the point fails to establish that Robertson agreed to deliver the peaches by or prior to 6:00 o’clock A.M. on Saturday, July 25, 1953.
Neither does the record establish that Sherman would have accepted the shipment had it arrived by 6:00 A.M. Sherman stated it should have been there when the market opened.
The movement of the truck and the points at which it was re-iced have already been recounted. There is no evidence of negligence or faulty icing on the trip. The driver'testified that, except for the time required for the icing and approximately an hour required to repair or adjust the ventilating' fan on the truck, his progress was uninterrupted. It would thus appear there-was no negligence on the part of the truck driver in handling the shipment to St.- Louis and therefore question (2) is answered in the negative. ’
As to question (3) the facts have likewise been related hereinabove. ■ It is apparent that young Robertson considered his responsibility over when he iced the truck under the instructions from Sherman and parked it at Sherman’s place 'of business as he was instructed. The question is whether dominion and control of the-shipment passed from Robertson to Sherman when the latter accepted the delivery receipts and personally gave instructions as to, the care and disposition thereof. It might be well here to observe that plaintiff contracted to transport and deliver a, truck load of peaches, which defendant, as it understood, had sold, to Sherman Produce Company. Plaintiff fulfilled, its pontract and agreement with the defendant. Neither party was aware of the fact that the peaches had not been sold but were merely consigned to Sherman Produce Company and that their acceptance could or would be refused, rejected or delayed on arrival. Actual and constructive delivery was made to the consignee at the time it accepted the delivery receipts. 13 C.J.S., verbo, Carriers, § 160 h, P- 314, in. part, recites the general rule thus:
“So, where the goods have reached their destination and the consignee or his agent gives, a receipt for the same, there is a final delivery, and it. makes no difference that a part of the goods are temporarily left on the carrier’s premises.”
Since Sherman was not the purchaser of the peaches but was the person named to receive the same on consignment, that is, for sale' on the market on behalf 'of the shipper, Sherman, therefore, was the agent of the shipper, the.defendant herein. It is *194 apparent that the contract of carriage was ended upon such delivery and the consignee had no right to utilize plaintiff’s truck for a warehouse, but, since it did so, it did so simply as a licensee. .Plaintiff’s truck was merely being used by the consignee as a place of, storage and the peaches were in its custody and under its dominion. It was its responsibility rather than young Robertson's to see that the proper care was taken of the peaches after it had accepted the shipment without any condition and even without inspection. Therefore, after delivery was made and the contract of carriage completed, there was, and could be, no further liability on the part of plaintiff from that time on, even as a warehouseman, as. the shipment was in the care and under the control and dominion of the consignee.
■ While this conclusion is sufficient to dispose of this case, we are further of the opinion that defendant has failed to establish its reconventional demands on other grounds. Defendant’s claim is based primarily upon the spoilage of the produce after it reached its destination and that it was the carrier’s burden to establish its freedom from fault. However, we are impressed that only a spot check or inspection and a rather cursory examination of a very limited number of the crates were made at the time the produce was loaded. No inspection whatever was made at the time the shipment arrived at the consignee’s place of business. Defendant loaded the produce and plaintiff had no duties in respect thereto. Neither did he have any duties relative to unloading the shipment.
It was contended that the peaches became hot in St. Louis while awaiting unloading after having been pre-cooled during their transportation. Referring to this, counsel states in brief:
“Once peaches become cool and later get hot, they become slick and cannot be revived and made first-class peaches.”
This statement may be as applicable to the condition surrounding the loading of the truck, and for this purpose attention is again directed to the fact that the first 96 crates loaded at Hilly about 10:00 o’clock P.M. were pre-cooled peaches; that the truck doors were opened and the loading of the 442 crates of peaches not previously pre-cooled at Spearsville consumed approximately 4 hours, The testimony is to the further effect that it takes several hours to pre-cool peaches. What effect of opening the truck doors and loading on these 442 crates of peaches not pre-cooled would have had upon the 96 crates of pre-cooled peaches already loaded is not shown by the testimony. If, as contended by the defendant, the spoilage, could result from over-heating after the produce arrived in St. Louis with the truck closed, we are unable to appreciate why the conditions surrounding the loading could not or would not have had the same or equal effect, especially taking into account the time necessary to pre-cool the latter part of the shipment after it was loaded. It does not therefore appear that defendant has borne its burden on this point and established that the produce was received by the carrier in good order and condition.
In Yuspeh v. Acme Fast Freight, Inc., La.App., 54 So.2d 866, 867, the general rule for recovery for damage to goods sustained in transit while being transported over common carriers is thus stated:
“In order for the consignee to make out a prima facie case against the carrier for damage to goods sustained in transit, it is necessary for him, under the principle so well established, to allege and prove (1) receipt of the goods by the carrier in good order and condition, (2) that the shipment arrived at its destination in a damaged condition, and (3) the amount of the loss. Bancroft v. Yazoo & M. V. R. Co., 194 La. 115, 193 So. 481; L. Frank & Co. v. Illinois Cent. R. Co., La.App. 43 So.2d 88; Colotra v. Railway Express Agency, La.App., 32 So.2d 69; Arwady v. Texas & N. O. R. Co., La.App., 18 So.2d 339. See also 9 Am. Jur., Carriers, §§ 834-835.”
*195 There could be no more onerous burden upon a private carrier in the absence of a more specific contractual obligation.
 The carrier is not an insurer of delivery of the commodity in sound condition, and it has been held that where perishable goods, such as food and vegetables, are damaged in transit, the carrier is not liable if its own negligence did not cause the damage. Close v. Missouri Pac. R. Co., La.App., 191 So. 596. In a shipment of perishable goods, as a prerequisite to recovery of damages, it is encumbent that it be first shown that they were delivered to the carrier in good condition. Arwady v. Texas & N. O. R. Co., La.App., 18 So.2d 339; Denton v. Ramsdell, La.App., 31 So.2d 873, and Colotra v. Railway Express Agency, Inc., La.App., 32 So.2d 69. Due consideration of the testimony of all the witnesses bearing on this point convinces us that the defendant has .failed to discharge by a preponderance of the. evidence the burden which rested upon it to show the good condition of the produce at the time of shipment or that the damage was not done by it at the time and during the loading of the produce, which damage could have as reasonably and as likely been caused at that time as during the period of time preceding the unloading at the point of destination.
Another important fact which we regard as significant, and the lack of sufficient, proof of which would preclude recovery by defendant, is the want of proof of loss sustained, if defendant should otherwise be entitled to recover. The only testimony on the price that defendant would have received for the peaches or their value had they been received in Sf. Louis in good condition was given by defendant’s president, J. B. Colvin. He was asked:
“Do you know what price you were to receive, or the Association was to receive for those peaches, the price per box? A. Now, I didn’t know at the time I shipped those peaches. I never knew a price on peaches until afterwards, as to what they were, but I was informed that those—price on those peaches were—coulda been sold up there for three dollars and a half ($3.50) a box”.
The witness did not testify as to what the market price was and his statement is based, as he so states, on information or hearsay. Such testimony is inconclusive, incompetent and insufficient for the purpose of establishing the market price or value of the produce, or to form a basis for an award in a judgment.
Oscar Sherman, partner in the Sherman Produce Company, in a deposition was asked, among other things to state a price which was to be paid by Sherman Produce Company for the peaches, to which he answered :
“They were not purchased, they were consigned and were to be sold according to the market”.
He ' was not asked and neither did he testify as to what the market price was.
While this case involves largely consideration of facts, we are not unmindful 'that the judgment of the trial court should not be reversed thereon unless clearly and manifestly erroneous. Our review and appreciation of the evidence, however, leads us to a different conclusion and impels a reversal.
The correctness of the charge for transportation of the shipment was admitted. Plaintiff sought an additional recovery for the loss of the use of his truck caused by the unnecessary delay in the unloading of the produce. As we have held, the delay was primarily caused by the Sherman Produce Company. It, and not the defendant, should be liable to plaintiff for whatever loss was occasioned thereby. ■
For the reasons assigned, the judgment appealed from is reversed and set aside and there is now judgment in favor of plaintiff, B. W. Robertson, doing business at Robertson Fruit and Produce, against the defendant, Louisiana Fruit Growers Association, for the full sum of $253.76, with 5 percent per annum interest thereon *196 from judicial demand until paid, and for all costs.
It is further ordered, adjudged and decreed that defendant’s reconventional demands be and the same are hereby dismissed and rejected at its costs.
Reversed and rendered.